## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 16 2019, 9:00 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Leanna Weissmann
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Matthew B. MacKenzie
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Timothy W. Bowman,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

April 16, 2019

Court of Appeals Case No.
18A-CR-1581

Appeal from the Ripley Circuit Court

The Honorable Ryan J. King, Judge

Trial Court Cause No.
69C01-1701-F1-5

**Crone, Judge.**

# Case Summary

What began as an incident of domestic violence ended several hours later after Timothy W. Bowman fired shots at police officers positioned outside his home and then shot himself in the chest. Bowman pled guilty to class A misdemeanor domestic battery and invasion of privacy, and a jury found him guilty of level 1 felony attempted murder and class A misdemeanor pointing a firearm. He now appeals, claiming that the trial court erred in declining to instruct the jury on criminal recklessness and challenging the sufficiency of the evidence to support his attempted murder conviction. He also appeals his forty-one-and-a-half-year aggregate sentence, claiming that it is inappropriate in light of the nature of the offenses and his character. Finding that the trial court acted within its discretion in declining the jury instruction and that the evidence is sufficient, we affirm his attempted murder conviction. Finding that Bowman has failed to meet his burden of demonstrating that his sentence is inappropriate, we affirm that as well.

# Facts and Procedural History

The facts most favorable to the jury's verdict are as follows. Bowman punched his wife ("Wife") in the face for refusing to cosign on a business loan. Bowman's sixteen-year-old daughter ("Daughter") witnessed the battery and went outside to phone her older sister ("Sister"). On her way to Bowman's house, Sister phoned 911 and her brother, Bowman's stepson ("Stepson"). Stepson came to the house to confront Bowman about striking Wife. Once inside, he heard Bowman load a magazine for a firearm, so he exited the house

to warn the other family members. Bowman chased him down and pointed a firearm directly at his back. Wife, Daughter, and Sister screamed, and Stepson ran into a nearby field and phoned police to let them know that Bowman was armed. Bowman went back inside the home.

[2] Five law enforcement officers arrived at the scene, and family members congregated outside the home. Bowman began making suicidal threats. Corporal Steve Sullivan spoke with Bowman through an open window, and Bowman threatened to "blow [him] away" if he came closer. Tr. Vol. 5 at 135. Another officer, Sergeant Herbert Houseworth, was familiar to Bowman because, three years earlier, he had been involved in investigating a fatal auto accident involving Bowman's older son. Bowman had remained angry over the way police had handled the investigation, and when he saw Sergeant Houseworth, his anger escalated and "turned to hate." Tr. Vol. 2 at 188-89. He had a high-powered rifle, and when he saw the sergeant out by a wood chipper, he announced his desire to shoot Houseworth in the head. He also stated that he could see Officer Steven Stepleton behind the wood chipper and could shoot his legs from where he was standing. A roadblock was set up, and the officers eventually repositioned themselves behind a white truck.

[3] Meanwhile, Bowman phoned his son ("Son") at work, told him about the standoff with police, and urged him to come to the house. Shortly before Son arrived, Bowman told him over the phone that he was "about to go out of this world." Tr. Vol. 4 at 28-29. Son drove through the roadblock, and Sergeant Houseworth and another officer ordered him out of his vehicle at gunpoint.

Immediately thereafter, Bowman emerged from the house armed with a handgun, shouting for Son. Trooper Travis Linville repeatedly ordered Bowman to drop the weapon and show his hands. Instead, Bowman raised the handgun, pointed it at Trooper Linville, and fired several shots, hitting the white truck. The trooper saw a bright muzzle flash and returned fire. Officer Stepleton also observed the bright flash and saw the barrel of Bowman's handgun pointed at him as he, Corporal Sullivan, and Trooper Linville hovered around the white truck. Trooper Linville fired two shots at Bowman, who retreated indoors and phoned a friend and his sister to tell them that he thought he had killed an officer. He then fired one shot into his own chest. He was treated for the self-inflicted wound at an area hospital.

[4] The State filed an information charging Bowman with domestic battery and invasion of privacy, both as class A misdemeanors, and he pled guilty to both charges. The State also charged him with level 1 felony attempted murder of the officers, with an enhancement for using a deadly weapon, and level 6 felony pointing a firearm at Stepson. A jury convicted him of level 1 felony attempted murder, acquitted him of the enhancement, and convicted him of pointing a firearm as a class A misdemeanor.

[5] At sentencing, the trial court found significant aggravating factors to include: (1) Bowman's shooting multiple shots at persons he knew to be law enforcement officers; (2) Bowman's committing his offenses in the presence of Daughter, a minor, as well as Son, age nineteen; and (3) serious emotional trauma suffered by Bowman's family and two of the officers. The trial court

identified as slight mitigators Bowman's criminal record and expressions of remorse. The court sentenced Bowman to an aggregate term of forty-one and a half years, comprising thirty-nine years for attempted murder, two nine-month consecutive terms for the class A misdemeanor offenses to which he pled guilty, and a consecutive one year of probation for class A misdemeanor pointing a firearm. Bowman now appeals his attempted murder conviction and his sentence. Additional facts will be provided as necessary.

## Discussion and Decision

### Section 1 – The trial court acted within its discretion in declining to give a jury instruction on criminal recklessness.

Bowman contends that the trial court erred in declining to instruct the jury on criminal recklessness as a lesser included offense of attempted murder. Jury instructions are intended "to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict." *Isom v. State*, 31 N.E.3d 469, 484 (Ind. 2015) (citation and quotation marks omitted), *cert. denied* (2016). We review jury instructions for an abuse of discretion. *Id*. When evaluating the trial court's refusal to give a party's tendered jury instruction, we determine "whether the tendered instructions correctly state the law, whether there is evidence in the record to support giving the instruction, and whether the substance of the proffered instruction is covered by other instructions." *Id*. at 485.

[7]     In determining whether to instruct a jury on a lesser included offense, the trial court must engage in a three-step analysis:

> First, the trial court must consider whether the alleged lesser included offense is an inherently included offense to the principal charge. If it is not, then the trial court must decide whether the alleged lesser included offense is a factually included offense to the principal charge. Finally, if the alleged lesser included offense is either an inherently or factually included offense to the principal charge, then the trial court must determine if there is a serious evidentiary dispute regarding the element that distinguishes the lesser offense from the principal charge. If such a dispute is present and a jury could conclude that the lesser offense was committed but not the principal charge, then it is reversible error for the trial court to refuse to give the jury instructions on the lesser included offense.

*Id.* (citations omitted).

[8]     Bowman concedes that criminal recklessness is not an inherently included offense of attempted murder. *See Ellis v. State*, 736 N.E.2d 731, 734 (Ind. 2000) (our supreme court has "consistently held that criminal recklessness is not an inherently included offense of attempted murder."). However, he asserts that criminal recklessness is a factually included offense of attempted murder under the facts of this case. To determine whether criminal recklessness is a factually included offense of Bowman's attempted murder charge, we examine the language of the charging information. *Id.* With respect to the attempted murder count, the charging information alleges, "Bowman knowingly or

intentionally[1] attempted to kill another human being. Bowman engaged in conduct that constituted a substantial step toward the commission of murder; to wit: fired multiple shots at [the named officers]." Appellant's App. Vol. 2 at 60. The charging information is devoid of any element of reckless behavior; therefore, criminal recklessness was not factually included in the crime charged. *See Ellis*, 736 N.E.2d at 735 (finding no error in trial court's refusal to instruct jury on criminal recklessness as factually included offense of attempted murder where charging information did not include any element of reckless behavior).

[9] Moreover, during the standoff, Bowman made verbal threats to kill two of the officers. He ultimately pointed his firearm directly at law enforcement officers as they attempted to take cover behind a truck. There was no evidence that he sprayed gunfire around the area. Rather, he threatened, pointed, and fired.[2] Thus, there was no serious evidentiary dispute on the issue of recklessness. As neither the charging information nor the record supports criminal recklessness as a factually lesser included offense of attempted murder, we find no abuse of discretion in the trial court's refusal to instruct the jury on criminal recklessness.

---

[1] As discussed more fully below, to convict Bowman of attempted murder, the State was required to prove beyond a reasonable doubt that he "acted with specific intent to kill" the officers. *Kadrovach v. State*, 61 N.E.3d 1241, 1245 (Ind. Ct. App. 2016), *trans. denied* (2017). We note that final jury instructions 3 and 4 omit "knowingly" and read in terms of Bowman acting with specific intent to kill the named officers. Appellant's App. Vol. 2 at 158. *See also Spradlin v. State*, 569 N.E.2d 948, 949 (Ind. 1991) (jury instruction on attempted murder must state that to find defendant guilty, jury must find that defendant specifically intended to kill victim).

[2] Bowman now claims that he intended to hit the truck rather than the officers. This claim does not allege reckless conduct, but rather, intentional conduct.

## Section 2 – The evidence is sufficient to support Bowman's attempted murder conviction.

[10]     Bowman also challenges the sufficiency of the evidence to support his attempted murder conviction. When reviewing a challenge to the sufficiency of evidence, we neither reweigh evidence nor judge witness credibility. *Moore v. State*, 27 N.E.3d 749, 754 (Ind. 2015). Rather, we consider only the evidence and reasonable inferences most favorable to the verdict and will affirm the conviction unless no reasonable factfinder could find the elements of the crime proven beyond a reasonable doubt. *Id*. Reversal is appropriate only when reasonable persons would be unable to form inferences as to each material element of the offense. *McCray v. State*, 850 N.E.2d 998, 1000 (Ind. Ct. App. 2006), *trans. denied*. The evidence need not "overcome every reasonable hypothesis of innocence." *Dalton v. State*, 56 N.E.3d 644, 647 (Ind. Ct. App. 2016) (quoting *Drane v. State*, 867 N.E.2d 144, 147 (Ind. 2007)), *trans. denied*.

[11]     Bowman limits his sufficiency of evidence challenge to his conviction for attempted murder. A person who knowingly or intentionally kills another human being commits murder. Ind. Code § 35-42-1-1(1). "A person attempts to commit a crime when, acting with the culpability required for commission of the crime, the person engages in conduct that constitutes a substantial step toward commission of the crime." Ind. Code § 35-41-5-1(a). However, since *Spradlin v. State*, 569 N.E.2d 948, 950 (Ind. 1991), "murder and attempted murder are no longer subject to the same level of culpability." *Kadrovach v. State*, 61 N.E.3d 1241, 1245 (Ind. Ct. App. 2016), *trans. denied* (2017). To

convict a person of attempted murder, the State must "prove beyond a reasonable doubt the defendant, with *intent to kill the victim*, engaged in conduct which was a substantial step toward such killing." *Id*. at 1243 (quoting *Spradlin*, 569 N.E.2d at 950). The intent to kill may be inferred from the deliberate use of a deadly weapon in a manner likely to cause death or serious injury. *Bethel v. State*, 730 N.E.2d 1242, 1245 (Ind. 1997). "And firing a gun in the direction of an individual is substantial evidence from which a jury may infer intent to kill." *Henley v. State*, 881 N.E.2d 639, 653 (Ind. 2008). "Intent to kill may be further established by a defendant's use of a deadly weapon against the victim coupled with an announced intention to kill." *Corbin v. State*, 840 N.E.2d 424, 429 (Ind. Ct. App. 2006).

[12] Bowman argues that the State failed to demonstrate a specific intent to kill the officers. He relies on *Henley*, 881 N.E.2d at 652, in which the defendant, holed up in a van after robbing two women and fleeing the scene, shot and killed a police dog that entered the van. Our supreme court reversed Henley's conviction for the attempted murder of the human officer, who did not enter the van but had the police dog on a fifteen-foot leash. *Id*. The *Henley* court emphasized that there was no evidence that Henley was aware of the presence of a police officer (or any other human) when he fired at the dog and that he therefore lacked a specific intent to kill the human officer. *Id*.

[13] We find *Henley* distinguishable. Here, the police presence was ubiquitous. In fact, Bowman claims that he had several opportunities to shoot the officers during the protracted standoff and could have done so had that been his intent

but instead shot at the truck, thus demonstrating a lack of specific intent to kill any of the officers. Appellant's Br. at 21. Notwithstanding, in his police interview, Bowman said that during the standoff, his negative feelings escalated and "turned to hate" when he saw that Sergeant Houseworth was on the scene. Tr. Vol. 2 at 188-89. Bowman had a handgun and a high-powered rifle. He made a verbal threat to "blow [] away" Corporal Sullivan when they conversed at the window. Tr. Vol. 5 at 135. He also threatened "to shoot [Sergeant Houseworth] in the head." Tr. Vol. 3 at 231-32; Tr. Vol. 5 at 136. He told Corporal Sullivan that he could see Sergeant Houseworth behind the wood chipper and could see Officer Stepleton's legs and could shoot him from where he was standing. Tr. Vol. 5 at 135-37. These threats prompted all five officers to seek cover behind the white truck. Even then, Trooper Linville and Corporal Sullivan each testified that they observed a muzzle flash when Bowman pointed his weapon at them and fired shots. Tr. Vol. 4 at 233-35; Tr. Vol. 5 at 150-51, 154. After Bowman fired those shots, he phoned a friend and his sister, telling them that he thought he had killed an officer. Tr. Vol. 5 at 105, 152.

[14]  Sufficient evidence supports the jury's conclusion that Bowman specifically intended to kill the officers. Bowman's arguments to the contrary are invitations to reweigh evidence and reassess witness credibility, which we may not do. Consequently, we affirm his attempted murder conviction.

# Section 3 – Bowman has failed to meet his burden of demonstrating that his sentence is inappropriate in light of the nature of his offenses and his character.

[15] Bowman asks that we review and revise his sentence pursuant to Indiana Appellate Rule 7(B), which states that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [this] Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." When a defendant requests appellate review and revision of his sentence, we have the power to affirm or reduce the sentence. *Akard v. State*, 937 N.E.2d 811, 813 (Ind. 2010). In conducting our review, our principal role is to leaven the outliers, focusing on the length of the aggregate sentence and how it is to be served. *Bess v. State*, 58 N.E.3d 174, 175 (Ind. 2016); *Foutch v. State*, 53 N.E.3d 577, 580 (Ind. Ct. App. 2016). This allows for consideration of all aspects of the penal consequences imposed by the trial court in sentencing, i.e., whether it consists of executed time, probation, suspension, home detention, or placement in community corrections, and whether the sentences run concurrently or consecutively. *Davidson v. State*, 926 N.E.2d 1023, 1025 (Ind. 2010). We do "not look to see whether the defendant's sentence is appropriate or if another sentence might be *more* appropriate; rather, the test is whether the sentence is 'inappropriate.'" *Foutch*, 53 N.E.3d at 581 (quoting *Barker v. State*, 994 N.E.2d 306, 315 (Ind. Ct. App. 2013), *trans. denied* (2014)). The defendant bears the burden of persuading this Court that his sentence meets the inappropriateness standard. *Bowman v. State*, 51 N.E.3d 1174, 1181 (Ind. 2016).

[16] In considering the nature of Bowman's offenses, "the advisory sentence is the starting point the Legislature has selected as an appropriate sentence." *Green v. State*, 65 N.E.3d 620, 637-38 (Ind. Ct. App. 2016), *trans. denied* (2017). When determining the appropriateness of a sentence that deviates from an advisory sentence, we consider whether there is anything more or less egregious about the offense as committed by the defendant that "makes it different from the typical offense accounted for by the legislature when it set the advisory sentence." *Holloway v. State*, 950 N.E.2d 803, 807 (Ind. Ct. App. 2011).

[17] Bowman's forty-one-and-a-half-year aggregate sentence comprises thirty-nine years for his level 1 felony conviction, nine months each for two of his class A misdemeanor convictions, and a one-year term, suspended to probation, for the remaining class A misdemeanor conviction. A level 1 felony carries a sentencing range of twenty to forty years, with a thirty-year advisory term. Ind. Code § 35-50-2-4(b). The maximum term for each of Bowman's class A misdemeanor convictions is one year. Ind. Code § 35-50-3-2.

[18] As we consider the nature of Bowman's offenses, we cannot help but be alarmed at how a misdemeanor domestic battery incident escalated to a dangerous, protracted standoff with police. After Bowman struck Wife, Daughter went outside and phoned Sister, who phoned 911 and Stepson. When Stepson arrived at the house to confront Bowman about the battery, Bowman loaded a firearm. Stepson left the house, only to be chased by Bowman, who had his weapon pointed right at Stepson's back. When police arrived, Bowman barricaded himself inside the house. Hoping to assuage

Bowman's anger, Corporal Sullivan attempted to communicate with him through an open window, only to have Bowman threaten to blow him away. Bowman expressed his disdain for Sergeant Houseworth and threatened to shoot him in the head. He also stated his desire to shoot Officer Stepleton in the legs. When Son arrived and drove through the roadblock, and officers ordered him out of his vehicle, Bowman emerged from the house with a firearm trained on the officers. Trooper Linville repeatedly ordered Bowman to drop his weapon, but he did not. Instead, he fired shots at the officers. Two of those officers described the flash of light and the barrel of Bowman's weapon pointed at them. But for Bowman's shots hitting the white truck instead of the officers, the carnage could have been significant.

[19] The impact of the standoff on the officers is reflected in the trial testimony of Corporal Sullivan and Sergeant Houseworth, both of whom provided intense and emotional descriptions of the incident. These two officers had been recipients of Bowman's death threats and struggled to describe the events of what they originally thought would be a dispatch to a domestic battery. Additionally, Trooper Linville suffered the trauma of believing that his shot had hit Bowman in the chest and only later discovered that Bowman's chest wound was the result of a self-inflicted gunshot. Bowman's family members were present at the scene and testified concerning the trauma of that day and the fear they now suffer as a result. In short, the nature of Bowman's offenses does not merit a shorter sentence.

[20] Likewise, Bowman's character does not militate toward a shorter sentence. We conduct our review of his character by engaging in a broad consideration of his qualities. *Aslinger v. State*, 2 N.E.3d 84, 95 (Ind. Ct. App. 2014), *clarified on other grounds on reh'g*, 11 N.E.3d 571. "When considering the character of the offender, one relevant fact is the defendant's criminal history." *Garcia v. State*, 47 N.E.3d 1249, 1251 (Ind. Ct. App. 2015), *trans. denied* (2016). Bowman points out that his criminal history is relatively minor compared to that of other offenders who typically become involved in standoffs with police. He has five misdemeanor convictions for theft, all occurring thirty years ago. The trial court acknowledged this but gave it only slight mitigating consideration when juxtaposed with the egregious circumstances surrounding his current offenses.

[21] Similarly, the court acknowledged Bowman's expressions of remorse but found them to be wavering and thus entitled to little mitigating consideration. *See Phelps v. State*, 969 N.E.2d 1009, 1020 (Ind. Ct. App. 2012) (Trial courts are uniquely situated to observe defendant and can best determine whether remorse is genuine), *trans. denied*. We agree with the trial court's observations and find Bowman's hatred and disrespect for law enforcement officers, particularly those involved in the investigation of his son's fatal accident, to be the prevailing theme of his life at this time. Bowman's assertions of remorse must be considered in conjunction with his attempts to deflect blame for his conduct, which he now attributes to his grief over his son's death three years before. While we in no way wish to downplay the grief a parent suffers over the sudden

death of a child, Bowman's relatives testified that he had rejected their suggestions that he get help to address his depression.

[22]    In this vein, we note that to whatever extent that Bowman's criminal conduct can be attributed to his grief over his dead son, we must also consider the extent to which Bowman's ensuing criminal conduct wrought devastation on his remaining family members. Wife wrote a victim impact letter, which was read in open court during sentencing, expressing the trauma suffered by her and the children and asking the trial court to impose a sentence that shows "mercy on our family to live a fear free life for as long as we can." Tr. Vol. 7 at 17. She explained that Bowman has exacerbated the family's fear and angst by continuing to contact them and their friends, both directly and indirectly, through an open letter to the newspaper. Wife described Bowman's statements in the open letter as conveying the message that he wants to come back home and pick up where he left off, that he believes that "everything still belongs to him," and that "when h[e] is released he will come and look us up and take back what he still thinks is rightfully his." *Id.* at 15. She indicated that Daughter is afraid to be alone in the house and has lost friends whose parents no longer allow them to come over. Wife also described Bowman's "continual letter writing to their friends" and stated that they have "all had to find new friends." *Id.* at 16. In short, Bowman's family members suffer not only trauma from the actual incident but also continued fear and upheaval due to Bowman's relentless attempts to communicate and manipulate the relationships amongst them and their friends. None of this reflects well on his character.

In sum, Bowman indulged his anger and grief in a way that proved devastating to everyone present during the standoff. He has failed to meet his burden of demonstrating that his sentence is inappropriate in light of the nature of the offenses and his character. Accordingly, we affirm his sentence.

Affirmed.

Vaidik, C.J., and Mathias, J., concur.