FILED

Jun 29 2016, 8:45 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Ross G. Thomas
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Deante Dalton,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | June 29, 2016<br><br>Court of Appeals Case No.<br>20A05-1508-CR-1098<br><br>Appeal from the Elkhart Circuit Court<br><br>The Honorable Terry C. Shewmaker, Judge<br><br>Trial Court Cause No.<br>20C01-1409-MR-4 |

**Bradford, Judge.**

# Case Summary

[1] On September 14, 2014, Appellant-Defendant Deante Dalton, along with two accomplices, participated in a violent home invasion which resulted in the

death of one of those accomplices, Dretarrius Rodgers. As a result of his participation in the home invasion and Rodgers's death, Dalton was subsequently charged with felony murder. Following a jury trial, Dalton was found guilty as charged.

[2] On appeal, Dalton contends that the evidence is insufficient to sustain his felony murder conviction. For its part, Appellee-Plaintiff the State of Indiana (the "State") argues that the evidence is sufficient to sustain Dalton's conviction. Concluding that the evidence is sufficient to affirm Dalton's conviction, we affirm.

# Facts and Procedural History[1]

[3] In September of 2014, Brenda Marsh lived in a home in Elkhart with her husband, Lewis; her four daughters, Daosha, Laqwela, ZaCarra, and Zameshia; her son, Dramar; Laqwela's boyfriend, Norman Gray, and their infant son, Landon; Daosha's young son, Julian; and Brenda's brother, Joe. The family knew Freddie Rhodes, who was a cousin of two of Brenda's daughters on their father's side of the family. The family also knew Dalton, whose mother was related to Brenda's cousin and who was a year ahead of ZaCarra in school. Both Rhodes and Dalton, who were friends, had previously

---

[1] We held oral argument in this case on June 16, 2016 at Hoosier Boys State on the campus of Trine University. We wish to thank counsel for their advocacy and extend our appreciation to the staff of Trine University as well as the organizers and participants of Hoosier Boys State for their fine hospitality.

been to the family's home. The family also knew Dretarrius Rodgers, as he had lived in their neighborhood when he was younger.

[4] At approximately 10:30 p.m. on September 14, 2015, Brenda left the family's residence to drive her mother home. While Brenda was gone, Dalton, Rhodes, and Rodgers arrived together at the family's home in Rhodes's silver Chrysler 300. Dalton, Rhodes, and Rodgers went to the family's home "fit'n on trying to rob someone." Tr. p. 950.

[5] Upon entering the family's residence, Dalton was wearing a ski mask. Rhodes and Rodgers wore bandanas over their faces. Rodgers also wore a glove on his left hand. All three men were armed with firearms. Dalton remained on the main level of the family's home while Rhodes and Rodgers went downstairs to the lower level.

[6] After going downstairs, Rhodes and Rodgers kicked in the door to the bedroom Laqwela and Norman shared with their infant son. Rhodes and Rodgers pointed their firearms at Laqwela, who was holding her son, and Norman, asking "where is the stuff?" Tr. p. 781. Laqwela attempted to flee upstairs to safety with her son, but remained downstairs after she saw Dalton standing at the top of the stairs pointing his firearm down at her.

[7] In an effort to protect Laqwela and their son, Norman told Rhodes and Rodgers that the "stuff" was in the laundry room under the dryer. Rhodes and Rodgers proceeded to the laundry room. While Rhodes and Rodgers attempted to

overturn the dryer, Norman turned off the lights, grabbed Rodgers, and began "tussl[ing]" and wrestling with him. Tr. p. 786.

[8] The tussle between Norman and Rodgers carried them out of the laundry room, into ZaCarra's downstairs bedroom, and into a downstairs family room. ZaCarra, who was hiding in her closet, and Laqwela both heard two sets of gunshots, with one set sounding louder than the other set. At some point during the tussle, Norman was shot four times in the chest, hip, hand, and shoulder. Rogers was also shot in the neck, wrist, hip, and buttock.

[9] Meanwhile, Brenda had returned home and recognized Rhodes's vehicle. After entering through her front door, Brenda was confronted by Dalton, who pointed his firearm at her and told her to "sit the f[***] down." Tr. p. 108. Brenda, recognizing Dalton by his eyes, initially responded, "little boy, this is not Halloween, you know, stop playing." Tr. p. 107. However, when Dalton repeated his command for her to "sit the f[***] down[,]" Brenda realized that Dalton was serious and complied with his order. Tr. p. 108. Dalton, who was holding the family's blue laptop computer under his arm, asked Brenda if anyone else was with her. Brenda responded in the negative. As Dalton was holding her at gunpoint, Brenda could hear a scuffle and loud noises coming from downstairs. She then heard four to five loud gunshots fired in rapid succession, followed by the sound of two or three softer gunshots and the sound of footsteps coming up the stairs.

[10] Rhodes, who was still holding a firearm, ran upstairs, tapped Dalton on the shoulder, and said "let's go, let's go, let's go." Tr. p. 117. Dalton then ran from the family's home, taking the family's laptop with him. Brenda immediately called 911. Upon retreating from the family's home, Rhodes got into the driver's seat of his vehicle and Dalton got into the front passenger seat. As Rhodes drove away, Dalton fired multiple gunshots toward the home, one of which went through the door frame and several others of which went through the front windows.

[11] Norman, who was bleeding heavily, was able to make it up the stairs before collapsing at the front door. He subsequently recovered from his injuries. Rodgers, on the other hand, collapsed at the bottom of the stairs and died. Rodgers's cause of death was later determined to be multiple gunshot wounds, one of which completely transected the jugular vein before cutting through the esophagus and the right lung.

[12] Later that evening, police located Rhodes's vehicle. The family's blue laptop computer was recovered from inside the vehicle. Police also recovered more gloves similar to the one that Rodgers wore during the incident as well a backpack containing Rhodes's identification from the trunk of Rhodes's vehicle. Dalton subsequently admitted to police that he had gone to the Marsh family's home with Rhodes and Rodgers to commit a robbery, had been inside the home while the attempted robbery took place, and knew Rodgers was armed during the commission of the attempted robbery.

On September 17, 2014, the State charged Dalton with felony murder. Following trial, which was conducted over the course of a number of days between June 15 and June 22, 2015, the jury found Dalton guilty as charged. The trial court subsequently sentenced Dalton to a term of fifty-five years. This appeal follows.

# Discussion and Decision

On appeal, Dalton contends that the evidence is insufficient to sustain his felony murder conviction.

> When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences supporting the verdict. It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it most favorably to the trial court's ruling. Appellate courts affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.

*Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007) (internal citations, quotations, and footnotes omitted). "In essence, we assess only whether the verdict *could* be reached based on reasonable inferences that may be drawn from

the evidence presented." *Baker v. State*, 968 N.E.2d 227, 229 (Ind. 2012) (emphasis in original). Further, a conviction can be sustained on only the uncorroborated testimony of a single witness, even when that witness is the victim. *Bailey v. State*, 979 N.E.2d 133, 135 (Ind. 2012) (citing *Ferrell v. State*, 565 N.E.2d 1070, 1072-73 (Ind. 1991)). The jury, acting as the trier-of-fact, is free to believe whomever it sees fit. *See Klaff v. State*, 884 N.E.2d 272, 274 (Ind. Ct. App. 2008).

## I. The Felony Murder Statute

Indiana Code section 35-42-1-1 provides that "[a] person who … (2) kills another human being while committing or attempting to commit … robbery … commits murder, a felony." "In its interpretation of this statute, [the Indiana Supreme Court] has determined that the State need not prove intent to kill, only the intent to commit the underlying felony." *Exum v. State*, 812 N.E.2d 204, 207 (Ind. Ct. App. 2004), *trans. denied*. "[T]he felony murder rule applies 'when, in committing any of the designated felonies, the felon contributes to the death of *any* person.'" *Forney v. State*, 742 N.E.2d 934, 938 (Ind. 2001) (quoting *Palmer v. State*, 704 N.E.2d 124, 126 (Ind. 1999) (footnote omitted, emphasis in original). Thus, "it matters not whether the death caused is that of the intended victim, a passerby[,] or even a co-perpetrator." *Id*. at 938-39.

A person who commits or attempts to commit one of the felonies designated in the felony-murder statute is criminally responsible for the death of another during the commission of said crime when the accused reasonably should have

"'foreseen that the commission of or attempt to commit the contemplated felony would likely create a situation which would expose another to the danger of death.'" *Palmer*, 704 N.E.2d at 126 (quoting *Sheckles v. State*, 684 N.E.2d 201, 205 (Ind. Ct. App. 1997), *trans. denied*). Where the death that occurs could reasonably have been foreseen, "'the creation of such a dangerous situation is an intermediary, secondary, or medium in effecting or bringing about the death of the victim. There, the situation is a mediate contribution to the victim's killing.'" *Id*. (quoting *Sheckles*, 684 N.E.2d at 205). The question therefore "is whether [the defendant's conduct] caused or contributed to [the victim's] death or set in motion a series of events that could reasonably be expected and did, in fact, result in his death." *Pittman v. State*, 528 N.E.2d 67, 70 (Ind. 1988).

## II.  Relevant Authority

### A. *Palmer*

[17]     In *Palmer*, Robert Williams, a parolee who had recently been released from prison, asked Jesse Palmer to accompany him to see his parole officer. 704 N.E.2d at 125. While at the parole office, correctional officers attempted to arrest Williams pursuant to a warrant relating to an alleged parole violation. *Id*. Williams resisted arrest and Palmer pulled a gun, held it to one of the officer's head, and said "I'm going to blow you away. Do what I tell you." *Id*. Palmer instructed the officer to let Williams go. *Id*. Upon being released, Williams instructed Palmer to shoot the officer. *Id*. During an ensuing struggle, the

officer was shot in the hand and another officer fatally shot Williams. *Id.* at 125-26.

[18] Palmer was subsequently charged with and convicted of felony murder in relation to Williams's death. *Id.* Upon review, the Indiana Supreme Court affirmed Palmer's felony murder conviction, finding that Palmer's conduct, *i.e.*, pointing a loaded handgun at the head of a corrections officer and thereafter firing the weapon and striking the officer, "clearly raised the foreseeable possibility that the intended victim might resist or that law enforcement would respond, and thereby created a risk of death to persons present. This felonious conduct was clearly 'the mediate or immediate cause' of Williams's death." *Id.*

## B. *Jenkins*

[19] In *Jenkins v. State*, Rodney Jenkins and Timothy D. Thomas attempted to rob Darrick C. Lawson while confining Lawson and Shalia R. Rogers. 726 N.E.2d 268, 270 (Ind. 2000). Jenkins and Thomas were armed with a gun during the attempted robbery. *Id.* During the attempted robbery, Thomas grabbed Lawson and Jenkins held a gun to Lawson's stomach. *Id.* Thomas instructed Lawson to lie on his stomach on the floor. *Id.* Thomas then taped Lawson's ankles together and his hands behind his back with tape that he and Jenkins had brought with them. *Id.* Meanwhile Jenkins retrieved Rogers from the second level of the apartment. *Id.* After bringing Rogers downstairs, Jenkins handed the gun to Thomas, who was standing on Lawson's back. *Id.* Jenkins then taped Rogers's eyes, mouth, and hands and instructed her to sit on a chair. *Id.*

Thomas demanded money and drugs from Lawson, who indicated that he didn't have any. *Id.* Thomas "watched" the victims while Jenkins searched the apartment. *Id.* During the search, Jenkins found Lawson's gun, which Jenkins then carried with him through the apartment. *Id.* Jenkins also took a spoon from the kitchen, heated it up, and threatened to torture the two victims. *Id.* Afraid that she was about to be tortured, Rogers revealed where some money was hidden upstairs. *Id.*

> [Jenkins] went upstairs, retrieved approximately $300.00, and returned to the main floor, stating that he found some money but that it was less than they had hoped to get. Thomas taped Lawson's mouth, turned up the volume on the television, and said that they had to kill Lawson. Thomas found a rope and decided to choke Lawson, rather than shoot him. Lawson initially refused to raise his head so that Thomas could wrap the rope around his neck, but then raised it when Thomas threatened to shoot him. Thomas wrapped the rope twice around Lawson's neck and held an end in each hand. As Thomas pulled the rope tight around Lawson's neck, Lawson freed his hands and tried to get up from the floor. Thomas struck Lawson twice on the head with the butt of a gun, but Lawson continued to arise. As Lawson struggled with Thomas, [Jenkins], still carrying Lawson's gun, took Rogers to the stairs. As the struggle continued, Lawson noticed, on a nearby couch, the gun that Thomas and [Jenkins] had brought to the apartment. Lawson, expecting to be killed, grabbed the gun and shot Thomas seven times, killing him. [Jenkins] then fled.

*Id.* at 270-71.

Jenkins was subsequently charged with and convicted of felony murder in relation to Thomas's death. *Id*. at 268. Upon review, the Indiana Supreme Court found as follows:

> The probative evidence supporting the felony murder, robbery, and confinement convictions is substantial. The evidence and reasonable inferences establish that the defendant and his co-perpetrator engaged in dangerously violent and threatening conduct and that their conduct created a situation that exposed persons present to the danger of death at the hands of a non-participant who might resist or respond to the conduct. The evidence and reasonable inferences also establish that Thomas's death was foreseeable and that the defendant's role in creating this dangerous situation, which included the use of at least two guns during the episode, was "'an intermediary, secondary, or medium in effecting or bringing about the death.'" *See Palmer*, 704 N.E.2d at 126 (quoting *Sheckles*, 684 N.E.2d at 205). We find sufficient probative evidence from which a reasonable trier of fact could have found, beyond a reasonable doubt, that the defendant was the mediate or immediate cause of Thomas's death and that this killing occurred during the defendant's commission or attempted commission of robbery.

*Id*. at 271.

## C. *Forney*

In *Forney*, Mark Bankhead and Michael Cornner met at Lafayette Square Mall in Indianapolis to sell a pound of marijuana to Chris Matthews. 742 N.E.2d at 936. The drug deal had been arranged by Jacqueline Woods. *Id*. Jamar Reynolds drove Woods and Matthews to the pre-determined location. *Id*. Reynolds's cousin, Guilford Forney, and Corey Henderson were also in the

vehicle with Reynolds, Woods, and Matthews. *Id.* Upon arriving at the predetermined location, Matthews and Woods exited Reynolds's vehicle and walked over to the automobile where Bankhead and Cornner sat. *Id.* Cornner showed Matthews the marijuana that he intended to sell before getting out of Bankhead's vehicle and into the back seat of Reynolds's vehicle. *Id.* Once in Reynolds's vehicle, Cornner asked, "Who wants the marijuana, lets make the deal." *Id.* No one in Reynolds's vehicle responded to Cornner's question. *Id.* Instead, Reynolds sped his vehicle away from Bankhead's vehicle. *Id.* Forney then instructed Matthews and Henderson to get the money by saying, "[G]et the scrill get the scrill." *Id.*

[23] Suddenly, Henderson pulled out a gun from between the front passenger seat and the door. *Id.* He pointed the gun at Cornner's stomach and said, "Shut up, empty your pockets." *Id.* "Cornner raised his hands and allowed Henderson to search his pockets for money." *Id.* "During this time, Forney 'mess[ed] with the radio' and said, '[L]ets go to my house.'" *Id.*

> Cornner then grabbed Henderson's wrist and hand that held the gun. As they struggled, Henderson pulled the trigger and the gun fired a bullet into Reynolds. Reynolds['s] head fell onto the steering column and the car sped through the intersection, over a median and down a ditch. Cornner, Forney, Matthews and Henderson jumped out of the car, leaving Reynolds in the driver seat. The car then crashed into the window of a furniture store.

*Id.* (internal record citations omitted).

Forney was subsequently charged with and convicted of felony murder in relation to Reynolds's death. *Id*. at 937. Upon review, the Indiana Supreme Court found that Forney's murder charge was based upon accomplice liability. *Id*. at 938. The Indiana Supreme Court also found that the evidence was sufficient to sustain Forney's conviction because Reynolds's death "was a 'natural and probable consequence' of the robbery." *Id*. (quoting *Wright v. State*, 690 N.E.2d 1098, 1110 (Ind. 1997)).

## D. *Layman*

In *Layman v. State*, sixteen-year-old Blake Layman and seventeen-year-old Levi Sparks were convicted of felony murder after one of their co-perpetrators was killed during an attempted burglary. 42 N.E.3d 972, 974 (Ind. 2015). Layman, Sparks, and sixteen-year-old Jose Quiroz decided to burglarize a home at which they believed no one was present and invited two other friends, eighteen-year-old Anthony P. Sharp, Jr., and twenty-one-year-old Danzele Johnson, to participate in the burglary. *Id*. Unbeknownst to the group, the intended victim was actually asleep in an upstairs bedroom. *Id*. After hearing the group "kicking in" the rear door of his home, the intended victim grabbed his handgun and cellular telephone and ran downstairs. *Id*. Upon seeing the intruders, the victim "began firing his weapon[,]" hitting both Layman and Johnson. *Id*. Johnson died as a result of the gunshot wound. *Id*.

Layman and Sparks were subsequently charged with and convicted of felony murder in relation to Johnson's death. *Id*. at 974-75. On review, the Indiana

Supreme Court overturned Layman's and Sparks's felony murder convictions, finding that the evidence was insufficient to prove that their conduct was the mediate or immediate cause of Johnson's death. *Id*. at 979. In overturning Layman's and Sparks's convictions, the Indiana Supreme Court found that unlike the situations presented in *Palmer*, *Jenkins*, and *Forney*, neither Layman, Sparks, "nor their cohorts engaged in any dangerously violent and threatening conduct." *Id*. at 979 (internal citation omitted).

## III. Whether the Evidence is Sufficient to Prove that Dalton's Actions Were the Mediate or Immediate Cause of Rodgers's Death

[27] In the instant matter, the evidence demonstrates that Dalton, Rhodes, and Rodgers entered the Marsh family's home for the purpose of committing a robbery. At the time, all three were armed with firearms. Upon entering the family's home, Rhodes and Rodgers went to the lower level and held Laqwela, Norman, and their infant son at gunpoint. As Laqwela attempted to flee upstairs to safety with her infant son, Dalton pointed his weapon at her, causing her to retreat. Dalton also threatened Brenda, forcing her to sit on the couch at gun point.

[28] While in the lower level of the family's home, Rodgers engaged in a scuffle with Norman. This scuffle moved into at least three rooms and resulted in both Norman and Rodgers suffering numerous gunshot wounds. These gunshot wounds resulted in injury to Norman and Rodgers's death. In addition, as

Dalton and Rhodes fled the family's home, Dalton took the family's laptop computer.

[29] In challenging the sufficiency of the evidence to sustain his felony murder conviction, Dalton argues that the evidence is insufficient to prove that his actions were the mediate or immediate cause of Rodgers's death. In support, Dalton argues that the facts of the instant matter are similar to those presented in *Layman*. However, unlike in *Layman*, Dalton, Rhodes, and Rodgers committed a violent home invasion during which they were all armed with loaded firearms. Dalton, for his part, engaged in violent and threatening conduct, both as a principal and as an accomplice. In addition, all three men pointed their weapons at their intended victims in a threatening manner, and at least two of the men, one of whom was Dalton, fired their weapons either inside or in the direction of the family's home.

[30] Also unlike in *Layman*, the evidence in the instant matter indicated that Dalton, Rhodes, and Rodgers anticipated that the home was occupied. The evidence establishes that when the three men arrived at the home, there were vehicles parked in the driveway. The evidence also establishes that the three men, who were familiar with the occupants of the home, attempted to conceal their identity by covering their faces with a ski mask and bandanas.

[31] We conclude that the situation presented here is more similar to the situations presented in *Palmer*, *Jenkins*, and *Forney* than that presented in *Layman*. Given the violent and threatening nature of Dalton's conduct considered together with

the Indiana Supreme Court's holdings in *Palmer*, *Jenkins*, and *Forney*, we conclude that the evidence presented is sufficient to prove that Dalton's actions were a mediate or immediate cause of Rodgers's death.

# Conclusion

[32] In light of the evidence most favorable to Dalton's conviction, we conclude that the State presented sufficient evidence to prove that Dalton's actions, both as a principal and as an accomplice, were a mediate or immediate cause of Rodgers's death. We therefore affirm the judgment of the trial court.

[33] The judgment of the trial court is affirmed.

Vaidik, C.J., and Barnes, J., concur.