## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Nov 13 2019, 8:38 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Donald R. Shuler
Barkes, Kolbus, Rife & Shuler, LLP
Goshen, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tiffany A. McCoy
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Shannon J. Danley, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | November 13, 2019 <br><br> Court of Appeals Case No. <br> 19A-CR-729 <br><br> Appeal from the <br> Elkhart Superior Court <br><br> The Honorable <br> Gretchen S. Lund, Judge <br><br> Trial Court Cause No. <br> 20D04-1805-CM-1184 |

**Kirsch, Judge.**

[1] Shannon J. Danley ("Danley") was convicted after a bench trial of battery[1] as a Class A misdemeanor and was sentenced to one year with credit for three days served and the balance suspended to probation. Danley appeals and raises the following restated issues for our review:

> I. Whether sufficient evidence was presented to support his conviction for battery; and

> II. Whether his sentence is inappropriate in light of the nature of the offense and the character of the offender.

[2] We affirm.

## Facts and Procedural History

[3] On May 27, 2018, James Robinson ("James") and his ex-wife Joanna Robinson ("Joanna") (together, "the Robinsons") were at the beach area of a local lake that was reserved for people in their neighborhood by the neighborhood association ("the beach"). *Tr.* at 25-26. Danley and his family were also at the beach for a graduation party, but there was limited interaction between the two groups. *Id.* at 26, 45. James and Joanna went home after staying at the beach for approximately an hour. *Id.* at 26. When Danley was getting ready to leave the beach after being there all day, he and his girlfriend Michelle Rittershouse ("Michelle") could not find the keys to one of their vehicles. *Id.* at 61.

---

[1] *See* Ind. Code § 35-42-2-1.

[4]     About an hour after James got home, Danley's children went to James's house looking for the lost car keys. *Id*. at 27, 61-62. Shortly thereafter, Danley and Michelle drove to James's house. *Id*. at 27, 61-62. James asked if Danley had found his keys, and a verbal fight started between Joanna and Michelle about drugs. *Id*. at 27, 34, 36, 62. During the fight, about seven more people showed up outside James's house. *Id*. at 29. Almost immediately the fight between Joanna and Michelle became physical with the women grabbing each other's hair. *Id*. at 27, 62. James attempted to break up the fight by putting himself in between Joanna and Michelle to separate the women. *Id*. at 28. Danley ran up to James and told him that he did not "have a problem" with James and told him it is "a girl fight," and to "get [his] girl." *Id*. at 29, 62. After James was able to separate Joanna and Michelle, things calmed down for a moment, but people were still yelling at each other. *Id*. at 28-29.

[5]     In an attempt to diffuse the situation and to get people to leave his yard, James started to record what was happening with his cell phone. *Id*. at 30. Someone told James to "stop videotaping" and tried to knock the phone out of his hand. *Id*. James then stuck the phone into his back pocket and then was hit from behind, causing him fall to the ground. *Id*. at 31. James did not see who had hit him that first time. *Id*. James stood up, walked to his front doorstep, and saw Danley near him. *Id*. When James was near his front door, he was hit in the face for a second time by an older man with a beard who was wearing

swimming trunks.[2] *Id.* at 21-22, 33; *Def.'s Ex.* A. After being hit the second time, James ended up being held in a headlock by Danley. *Tr.* at 31-32. Danley held James in a headlock for approximately twenty seconds, asked James if he "had enough," and then released James. *Id.* at 31, 62. As a result of this altercation, James had a black eye and sustained two cuts near his eye, which caused him pain and resulted in a scar on his face. *Id.* at 32-33.

[6]     Elkhart County Sheriff's Department Officers Cory Oswald ("Officer Oswald") and Antonio Mantey ("Officer Mantey") responded to a dispatch regarding the altercation. *Id.* at 13-14, 40-41. Officer Oswald first approached the Robinsons' residence and noticed that Joanna appeared to be extremely upset and frustrated and that James was holding a wet napkin to his right eye and seemed confused as to what had transpired. *Id.* at 42-43. When James removed the napkin from his eye, Officer Oswald observed that the napkin had fresh blood on it and that James's eye was swollen and had a laceration underneath it. *Id.* at 43. Based on his conversation with the Robinsons, Officer Oswald and Officer Mantey went to Danley's residence to speak with him. *Id.* at 14, 43.

[7]     When the officers arrived at Danley's address, there were numerous people at the residence. *Id.* at 14, 43-44. Danley identified himself to Officer Oswald with his name and date of birth. *Id.* at 44. At that time, Officer Oswald

---

[2] Officer Antonio Mantey testified that James told him that he was hit a second time by a man with a beard wearing an unbuttoned floral shirt and swimming trunks. *Tr.* at 21. However, the officer later confirmed that his police report contained a statement from James that he was struck the second time by a shirtless man. *Id.* at 21-22.

observed that Danley was wearing swimming trunks and no shirt and that he could smell the odor of an alcoholic beverage on Danley's breath. *Id.* at 44. While speaking with the officers, Danley repeatedly denied that he was involved in any altercation at the Robinsons' residence and claimed that he arrived at the Robinsons' residence after any altercation had ended. *Id.* at 15, 45. The officers observed that Danley had dried blood on his feet, shin, stomach, and left hip area. *Id.* at 16, 45, 47-48; *Exs.* 4, 5, 6, 7, 8. After speaking with Danley, Officer Mantey made the decision to detain him while the officers conducted their investigation for battery. *Tr.* at 16-17. Officer Oswald transported Danley to the Elkhart County Jail, and Officer Mantey went back to the Robinsons' residence to take photos and further statements. *Id.* at 17-19, 45.

[8] At the Elkhart County Jail, Danley told Officer Oswald that he had blood on him because he cut his feet while kayaking. *Id.* at 48. Officer Oswald checked Danley's feet, and he did not see any fresh lacerations or open wounds that could be a source of bleeding. *Id.* While in detention, Danley again denied any involvement in the altercation, but later made a comment that "people that sell drugs to kids deserve their ass whooped." *Id.* at 48-49, 66.

[9] On May 30, 2018, the State charged Danley with battery as a Class A misdemeanor. *Appellant's App. Vol. 2* at 14. A bench trial was held on February 5, 2019. *Id.* at 8. At trial, Danley admitted that he was present during the altercation and held James in a headlock for approximately twenty seconds until James "said he would quit." *Tr.* at 61-62. Danley also testified that, when

he spoke to the officers, he denied involvement in the altercation "because [he] didn't want to be in trouble for what all had happened," and he thought "if [he] just denied it completely it would go away . . . ." *Id*. at 63, 66. After taking the matter under advisement, the trial court found Danley guilty as charged on March 3, 2019. *Id*. at 34-37. At sentencing, the trial court sentenced Danley to one year with credit for three days served and the remaining time suspended to reporting probation. *Id*. at 85; *Appellant's App. Vol. 2* at 42. Danley now appeals.

# Discussion and Decision

## I. Sufficiency of the Evidence

[10] Danley argues that the evidence presented at trial was insufficient to support his conviction. When we review the sufficiency of evidence to support a conviction, we do not reweigh the evidence or assess the credibility of the witnesses. *Lehman v. State,* 55 N.E.3d 863, 868 (Ind. Ct. App. 2016), *trans. denied.* We consider only the evidence most favorable to the verdict and the reasonable inferences that can be drawn from that evidence. *Fuentes v. State,* 10 N.E.3d 68, 75 (Ind. Ct. App. 2014), *trans. denied.* We also consider conflicting evidence in the light most favorable to the trial court's ruling. *Oster v. State,* 992 N.E.2d 871, 875 (Ind. Ct. App. 2013), *trans. denied.* We will not disturb the verdict if there is substantial evidence of probative value to support it. *Fuentes,* 10 N.E.3d at 75. We will affirm unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Delagrange v. State*, 5 N.E.3d 354, 356 (Ind. 2014). A conviction can be sustained on the

uncorroborated testimony of a single witness, even when that witness is the victim. *Dalton v. State*, 56 N.E.3d 644, 648 (Ind. Ct. App. 2016), *trans. denied*.

[11] Danley contends that the evidence presented by the State was not sufficient to prove beyond a reasonable doubt that he was guilty of battery as a Class A misdemeanor. Specifically, he asserts that, although the evidence established that he and James were involved in an altercation and that at some point he had James in a headlock, the evidence did not prove that James's injuries were the result of any touching by Danley. Danley also points to inconsistencies in James's description of who hit him in the face and caused his injuries.

[12] Danley was convicted of Class A misdemeanor battery. In order to convict him of that crime, the State was required to prove beyond a reasonable doubt that he "knowingly or intentionally . . . touche[d] another person in a rude, insolent, or angry manner" and that the touching resulted in bodily injury to the person. Ind. Code § 35-42-2-1(c)(1), (d)(1). Bodily injury is defined as "any impairment of physical condition, including physical pain." Ind. Code § 35-31.5-2-29. "Evidence of touching, however slight, is sufficient to support a conviction for battery." *Wolf v. State*, 76 N.E.3d 911, 915 (Ind. Ct. App. 2017) (citation omitted).

[13] Here, the evidence most favorable to the verdict showed that, after a verbal and physical altercation occurred between Joanna and Michelle, James was hit from behind, then punched in the face and put in a headlock. *Tr.* at 31-33. As a result, James sustained a black eye and two cuts near his eye, which caused him

pain and left a scar on his face. *Id*. at 32; *Exs*. 3, 4, 12, 13. Although James did not see who hit him from behind, he reported to the officers that he was hit in the face the second time by an older man with a beard who was wearing swimming trunks.[3] *Tr*. at 21-22, 33; *Def.'s Ex*. A. James testified that he was hit in the face when he was near his doorstep, and he remembered Danley was near him at that time. *Tr*. at 31, 33. Danley admitted at trial that he held James in a headlock for approximately twenty seconds and asked James if he "had enough." *Id*. at 31, 62. When the police made contact with Danley and spoke to him, he was dressed consistently with James's description of the man who hit him in the face. *Id*. at 15, 21-22; *Ex*. 3; *Def.'s Ex*. A.

[14] Additionally, Danley repeatedly lied to the police when he initially spoke with them the night of the battery. He continuously denied he had been at James's residence during the altercation and that he had been involved in the altercation at all. *Tr*. at 45. Instead, he claimed that he had only arrived at James's residence after the altercation had ended. *Id*. However, Danley had dried blood on his foot, shin, stomach, and hip area. *Id*. at 16, 45, 47-48; *Exs*. 4, 5, 6, 7, 8. The injuries that James had sustained were bleeding, and Danley was the only other person observed to have blood on him. *Tr*. at 16-17, 23. When asked by the police about the dried blood, Danley stated that it was from cuts

---

[3] We note that there was inconsistent evidence as to whether Danley was wearing an unbuttoned floral shirt during the altercation with James. *Tr*. at 21-22. However, it is reasonable to infer that a man wearing an unbuttoned shirt may have appeared as shirtless. Moreover, the trial court, in its order, recognized this inconsistency and found that "it would be reasonable for a person to be confused after having been hit in the head." *Appellant's App. Vol. 2* at 37.

he sustained to his feet from kayaking; however, the police did not observe any fresh lacerations or injuries that could be the source of the dried blood. *Id*. at 48. At trial, Danley testified that, when he spoke to the officers, he denied involvement in the altercation "because [he] didn't want to be in trouble for what all had happened," and he thought "if [he] just denied it completely it would go away . . . ." *Id*. at 63, 66. Based on the evidence most favorable to the verdict presented at trial, we conclude that sufficient evidence was presented to support Danley's conviction for battery.

## II. Inappropriate Sentence

[15] Danley argues that his sentence is inappropriate. Pursuant to Indiana Appellate Rule 7(B), this court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the [c]ourt finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Our Supreme Court has explained that the principal role of appellate review should be to attempt to leaven the outliers, "not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). We independently examine the nature of Danley's offense and his character under Appellate Rule 7(B) with substantial deference to the trial court's sentence. *Satterfield v. State*, 33 N.E.3d 344, 355 (Ind. 2015). "In conducting our review, we do not look to see whether the defendant's sentence is appropriate or if another sentence might be more appropriate; rather, the test is whether the sentence is 'inappropriate.'" *Barker v. State*, 994 N.E.2d 306, 315 (Ind. Ct. App. 2013), *trans. denied*. Whether a sentence is inappropriate

ultimately depends upon "the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other factors that come to light in a given case." *Cardwell*, 895 N.E.2d at 1224. Danley bears the burden of persuading us that his sentence is inappropriate. *Id.*

[16] Danley contends that his one-year sentence with credit for time served and the balance suspended to probation is inappropriate in light of the nature of his offense and his character. As to the nature of the offense, he asserts that the circumstances of the offense were minimal and James's injuries were not serious, and that there was nothing particularly egregious about the offense to support the imposition of the maximum length sentence. As to his character, Danley maintains that his sentence is inappropriate because his criminal history is minor, occurring many years ago and having no connection to the instant offense, and he is a veteran who has steady employment.

[17] Here, Danley was convicted of one count of Class A misdemeanor battery. The sentencing statute for Class A misdemeanors provides that "[a] person who commits a Class A misdemeanor shall be imprisoned for a fixed term of not more than one (1) year[.]" Ind. Code § 35-50-3-2. The trial court imposed a one-year sentence with credit for three days served and the balance suspended to reporting probation. *Appellant's App. Vol. 2 at 2.*

[18] As this court has recognized, the nature of the offense is found in the details and circumstances of the commission of the offense and the defendant's participation. *Perry v. State*, 78 N.E.3d 1, 13 (Ind. Ct. App. 2017). "When

determining the appropriateness of a sentence that deviates from an advisory sentence, we consider whether there is anything more or less egregious about the offense as committed by the defendant that 'makes it different from the typical offense accounted for by the legislature when it set the advisory sentence.'" *Moyer v. State*, 83 N.E.3d 136, 142 (Ind. Ct. App. 2017) (quoting *Holloway v. State*, 950 N.E.2d 803, 807 (Ind. Ct. App. 2011)), *trans. denied*. In the present case, a physical altercation between Joanna and Michelle occurred, which James attempted to break up by putting himself between the two women. After trying to diffuse the situation by recording what was happening on his cellphone, James was hit from behind and then hit in the face and put into a headlock. Although James did not see who hit him from behind, the evidence showed that Danley hit James in the face and then held him in a headlock for about twenty seconds. This battery by Danley resulted in James having a black eye and two cuts on his face, which caused him pain and a scar on his face. When approached by the police, Danley repeatedly lied about being at James's residence and being involved in the altercation.

[19]    The character of the offender is found in what we learn of the offender's life and conduct. *Perry*, 78 N.E.3d at 13. When considering the character of the offender, one relevant fact is the defendant's criminal history. *Johnson v. State*, 986 N.E.2d 852, 857 (Ind. Ct. App. 2013). The evidence showed that Danley had a minimal criminal history that consisted of two misdemeanor convictions from 2007, one for driving while suspended and one for possession of marijuana. *Tr.* at 82. "'Even a minor criminal record reflects poorly on a

defendant's character.'" *Morris v. State*, 114 N.E.3d 531, 539 (Ind. Ct. App. 2018) (quoting *Reis v. State*, 88 N.E.3d 1099, 1105 (Ind. Ct. App. 2017)), *trans. denied*. Additionally, Danley's repeated lying to the police about being involved in the altercation at James's residence demonstrates poor character. When he first spoke to the police, Danley denied that an altercation occurred and claimed that he arrived at James's residence after everyone had left. When asked about the dried blood on his person, Danley initially stated it was his own blood from kayaking, but the officers could not find any wounds from which the blood could have come. At trial, Danley testified that he denied involvement in the altercation "because [he] didn't want to be in trouble for what all had happened," and he thought "if [he] just denied it completely it would go away . . . ." *Tr.* at 63, 66. Although we commend Danley for his military service, his repeated lies to the police to avoid responsibility show a lack of respect for authority. We conclude that Danley has not shown that his one-year sentence with credit for time served and the balance suspended to reporting probation is inappropriate in light of the nature of the offense and his character.

[20] Affirmed.

Baker, J., and Crone, J., concur.