## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 21 2020, 9:40 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

James H. Voyles, Jr.
Tyler D. Helmond
Voyles Vaiana Lukemeyer Baldwin &
Webb
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Tiffany A. McCoy
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jennifer Cook,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

August 21, 2020

Court of Appeals Case No.
19A-CR-3058

Appeal from the Bartholomew
Superior Court

The Honorable James D. Worton,
Judge

Trial Court Cause No.
03D01-1711-F6-6183

**Crone Judge.**

## Case Summary

[1] A jury convicted Jennifer Cook of two counts of level 6 felony stalking and ordered her to pay $800 in restitution to her victims, Brian and Katrina Brumley (collectively the Brumleys). Cook appeals, contending that the trial court abused its discretion in admitting certain testimony and that the evidence is insufficient to support her convictions. She also challenges the trial court's restitution order. We affirm Cook's convictions and remand with instructions to correct the restitution order.

## Facts and Procedural History

[2] The facts most favorable to the jury's verdict are as follows. For nearly a decade, the Brumleys have lived in their rural Bartholomew County home with their teenage daughter (Daughter), who suffers from uncontrollable, unsustainable epilepsy and has the cognitive function of a fifth grader. The family has historically owned Great Pyrenees dogs to protect their goats, ducks, chickens, miniature donkey, and miniature horse from predators such as coyotes, foxes, and bobcats. A few years after the Brumleys moved in, Cook and her husband moved into the large house across the road and erected an iron and brick fence around the house. At first, the relationship between Cook and the Brumleys was amicable, but it began to deteriorate in late 2016, shortly after the Brumleys purchased their most recent Great Pyrenees dog (the Dog). Cook complained about the Dog running loose on the Brumleys' property and defecating in the corner of her lot outside the fence. The Brumleys responded by cleaning up the Dog's feces and attempting to keep the Dog confined. The

Dog barked when confined and sometimes broke free of its restraints, and Cook continued to complain. In an effort to muffle the sound, the Brumleys tried moving the Dog to various areas on the property farther from Cook's house. At no time did the Dog bite or act aggressively toward any person.

[3] In April 2017, Cook set up loudspeakers and pointed them toward the Brumleys' house. She began playing recordings of animal noises, including barking, goat sounds, and animal call noises designed to attract predators. She often played the recordings throughout the night until dawn. The first time she did this, Daughter woke up in a panic, thinking that her baby goat, which she showed at the 4-H fair, had escaped from its pen. She woke up Mrs. Brumley, and the two searched outside and determined that the loud goat noises were coming from Cook's yard. When they peered through the shrubs to see if the baby goat was there, a deep voice warned, "[D]on't move or I am going to shoot you[.]" Tr. Vol. 2 at 149. When the panicked Daughter asked for her goat, Cook replied that she did not have it. The Brumleys phoned 911. A few minutes later, a police officer arrived, and Cook refused to open her gate for the officer. It was discovered that the goat noises had been a recording emanating from Cook's loudspeakers and that Daughter's baby goat had not gotten loose.

[4] Cook continued this pattern of blasting the animal noises throughout the summer and through October 2017. She posted a sign on her fence stating that animal sounds would be played from 9:00 p.m. to 9:00 a.m. as part of a study and notifying readers not to contact her about the noises. State's Ex. 11. The noises agitated the Brumleys' animals. On one occasion, Cook blasted the

animal noises for seventy-two consecutive hours. Between April and October 2017, the Brumleys lost fifteen to twenty animals to predators. The Brumleys (and other neighbors who heard the loud noises) called 911, which precipitated regular visits from law enforcement, sometimes multiple visits in a single day. Each time, Cook refused to speak to police. When she finally spoke to Captain David Steinkoenig, he warned her to stop playing the recordings or risk a disorderly conduct charge. She told him that she began playing the recordings because the Brumleys' animals had irritated her for years and that when she learned that the recordings were agitating the animals, she continued to play them for revenge.

[5]     Cook also installed surveillance cameras, several of which she positioned directly toward the Brumleys' house. When the cameras picked up any outdoor activity by the Brumleys or showed them arriving home from work, Cook would begin blasting the animal noises. When the animal noises were not playing and Cook saw any of the Brumleys outside, she yelled profanities, ridiculed them for their economic status, and made remarks about Daughter's seizures. When she did not see them, she sent them text messages, insulting them and calling them pathetic pieces of excrement. In August 2017, she sent text messages warning them that she had made arrangements to buy their house in foreclosure so she could bulldoze it to make room for a pole barn. State's Ex. 46. Daughter's epileptic seizures increased in severity and frequency due to lack of sleep and her fear of going outside. On at least one occasion, Cook flew

a drone over the Brumleys' goat pens, low enough that it frightened and antagonized the goats and the Dog.

Police obtained a search warrant for Cook's property and recovered surveillance cameras, monitors, computers, cell phones, and speakers/audio devices. The State charged Cook with one count of level 6 felony stalking of Mrs. Brumley and one count of level 6 felony stalking of Mr. Brumley. The jury convicted her as charged, and the trial court sentenced her to concurrent two-year terms, with four months executed and twenty months suspended to probation. The court also ordered her to pay the Brumleys $800 as restitution. Cook now appeals. Additional facts will be provided as necessary.

## Discussion and Decision

## Section 1 – The trial court acted within its discretion in admitting the challenged testimony.

Cook contends that the trial court erred in admitting certain testimony by Mr. Brumley. We review evidentiary rulings for an abuse of discretion resulting in prejudicial error. *Williams v. State*, 43 N.E.3d 578, 581 (Ind. 2015). An abuse of discretion occurs when the trial court's ruling is either clearly against the logic and effect of the facts and circumstances before it or the court misinterprets the law. *Id.*

Cook asserts that certain testimony by Mr. Brumley allegedly amounted to an inadmissible opinion on the ultimate question of her guilt. *See* Ind. Evidence Rule 704(b) (prohibiting witness from giving "opinions concerning intent, guilt,

or innocence in a criminal case."). Cook was convicted of two counts of level 6 felony stalking, which required the State to prove that she (1) knowingly or intentionally; (2) engaged in a course of conduct involving repeated or continuing harassment of another person; (3) that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened; and (4) that actually caused the victim to feel terrorized, frightened, intimidated, or threatened. Ind. Code § 35-45-10-1.

[9] Cook challenges the admissibility of the following testimony provided by Mr. Brumley during direct examination:

> A: There, there was an incident where I was, I had been fishing, and I was cleaning fish and kind of heard something and looked around, I thought my wife was calling me. And uh, first time and then it happened again, I mean, looking around and uh I can … then I finally recognized the defendant and she was in between the brick uh support for the fence and her shrub, and she was saying something to me. I could hear some, but I tried not to pay attention. And uh I just shook my head, uh probably said you're crazy, or something like that and uh went on. And then went on cleaning my fish and then, at a point where I wasn't mak[ing] noise of something I heard her say you're going to need one.
>
> Q: You had no idea what that was referring to?
>
> A: Uh, no. I mean it was a threat of some kind.

Tr. Vol. 3 at 230-31. Defense counsel objected on grounds of Indiana Evidence Rule 704(b), but the objection was overruled. Mr. Brumley went on to state that Cook had said, "you are going to need one. I took that as a threat." *Id*. at

231. When asked if that caused him to feel threatened, Mr. Brumley said that it did. *Id*. at 232.

[10] Cook claims that the foregoing testimony amounted to an opinion by Mr. Brumley that she was guilty of stalking him. In support of her argument, Cook cites *Williams*, where an officer testified that he observed what he characterized as a "transaction for cocaine." 43 N.E.3d at 582. The *Williams* court found the characterization to be an improper statement that invaded the province of the jury by establishing the ultimate issue of the defendant's guilt for dealing in cocaine. *Id*.

[11] Cook's argument is misplaced. Mr. Brumley simply described Cook's conduct and then said that he interpreted it as a threat. In other words, Cook's conduct actually caused him to feel threatened. This speaks to only one of the four elements of the offense, i.e., that the defendant's conduct actually caused the victim to feel terrorized, frightened, intimidated, or threatened. Proof of this element requires resort to the thoughts and impressions of the victim. Mr. Brumley's testimony does not amount to an opinion on the ultimate issue of Cook's guilt. As such, the trial court acted within its discretion in admitting the testimony.

## Section 2 - The evidence is sufficient to support Cook's convictions.

[12] Cook also challenges the sufficiency of the evidence to support her convictions. When reviewing a challenge to the sufficiency of evidence, we neither reweigh

evidence nor judge witness credibility. *Moore v. State*, 27 N.E.3d 749, 754 (Ind. 2015). Rather, we consider only the evidence and reasonable inferences most favorable to the verdict and will affirm the conviction unless no reasonable factfinder could find the elements of the crime proven beyond a reasonable doubt. *Id.* Reversal is appropriate only when reasonable persons would be unable to form inferences as to each material element of the offense. *McCray v. State*, 850 N.E.2d 998, 1000 (Ind. Ct. App. 2006), *trans. denied*. The evidence need not "overcome every reasonable hypothesis of innocence." *Dalton v. State*, 56 N.E.3d 644, 647 (Ind. Ct. App. 2016) (citation omitted), *trans. denied*.

[13] Cook was convicted of two counts of level 6 felony stalking. As stated, stalking is a

> knowing or intentional course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened. The term does not include statutorily or constitutionally protected activity.

Ind. Code § 35-45-10-1. Harassment is "conduct directed toward a victim that includes but is not limited to repeated or continuing impermissible contact that would cause a reasonable person to suffer emotional distress and that actually causes the victim to suffer emotional distress. Harassment does not include statutorily or constitutionally protected activity[.]" Ind. Code § 35-45-10-2.

"Impermissible contact includes but is not limited to knowingly or intentionally following or pursuing the victim." Ind. Code 35-45-10-3 (2017).[1]

[14]  For the first time on appeal, Cook raises as part of her sufficiency argument a claim that her conduct amounted to constitutionally protected speech. A constitutional claim is waived if it is not first presented below. *Pava v. State*, 142 N.E.3d 1071, 1075 (Ind. Ct. App. 2020), *trans. denied*. Cook failed to raise this issue in the trial court and therefore has waived review of it. Even so, we note that surveilling the Brumleys through cameras pointed directly at their house and through the use of a drone cannot be considered speech at all, let alone constitutionally protected speech. Moreover, police officers had specifically warned Cook that her conduct amounted to criminal conduct, and her text messages confirm that she knew that she was crossing the line between exercising her free speech right to play animal noises and engaging in illegal conduct. State's Ex. 43.[2]

---

[1] In 2019, the legislature amended Indiana Code Section 35-45-10-3 to expressly include communications in person, in writing, by telephone, by electronic means, or through social media. Both versions of the statute clearly state that the list of acts constituting impermissible contact is nonexclusive.

[2] Cook also claims that the offenses were imprecisely charged in the information and that, as a result, she was not put on notice concerning the specific conduct that served as the basis for the charges against her. The proper method for challenging deficiencies in a charging information is by filing a motion to dismiss the information no later than twenty days before the omnibus date, in cases involving felony charges. *Leggs v. State*, 966 N.E.2d 204, 207 (Ind. Ct. App. 2012); Ind. Code § 35-34-1-4(a)(4), -(b)(1). Cook did not do so. Thus, absent a showing of fundamental error, she has waived this issue for consideration on appeal. *Truax v. State*, 856 N.E.2d 116, 123 (Ind. Ct. App. 2006). Cook did not allege fundamental error, so we need not resolve the issue.

[15] Although Cook alleges that the evidence was insufficient as to both of her stalking convictions, she focuses her argument on the count involving Mr. Brumley. She essentially claims that the evidence was insufficient to establish at least two incidents of conduct, aimed at Mr. Brumley, that would cause a reasonable person to feel threatened. We disagree. In addition to the fish-cleaning incident discussed in Section 1 of this decision, Mr. Brumley recalled another specific incident in which he was working on his motorcycle and Cook said, "[W]hy don't you be a little bit louder, so that the IRS can hear you and come take your, come take your property." Tr. Vol. 3 at 234.[3] This was especially significant to Mr. Brumley when considered in conjunction with other economic threats that Cook made to the Brumleys in a series of text messages, declaring her intention to buy his family's home out from under them at an upcoming foreclosure sale. *See*, *e.g.*, *Id.* at 235 (Mr. Brumley's testimony describing text from Cook stating that "a pole barn was going to look nice on her property, after she owns our house and bulldozes it to the ground"). We also note that both instances involved an element of surprise, where unbeknownst to Mr. Brumley, Cook had been watching him and suddenly broke into his presumed solitude and made him feel threatened with her warnings and admonitions.

---

[3] One or two days later, the Brumleys unexpectedly received correspondence in the mail from the IRS. Although the correspondence was later determined to have been sent by mistake, it seemed a startling coincidence to receive it so quickly after Cook had warned Mr. Brumley about the IRS coming to take their property.

[16] Overall, Mr. Brumley's testimony shows a protracted pattern of daily/nightly conduct by Cook, aimed directly at him (and his wife), where the cumulative effect of the conduct was greater than the sum of a couple isolated parts. Cook's barrage of harassment made him feel frightened and intimidated to the point that he purchased a concealed carry permit. He testified that he dreaded coming home from work each evening because he knew that he would be constantly watched and that the animal noises would begin. He described the effect of Cook's behavior as follows: "You're constantly looking over your shoulder … glancing to see if someone is there, you're watched." Tr. Vol. 3 at 229. He testified that he had experienced prolonged sleep deprivation due to Cook's persistent "daytime and nighttime" conduct. *Id*. at 227. He also experienced an increase in parental fear for the life of his seriously ill teenager, whose seizures had increased in frequency and severity during Cook's six-month onslaught. The evidence and inferences support the jury's conclusion that a reasonable person would have felt threatened by Cook's persistent, intentional conduct toward Mr. Brumley.

[17] Cook's conduct toward Mrs. Brumley was equally egregious and even more persistent. Because the Brumleys have livestock and a vegetable garden, they regularly must spend time outdoors to tend to them. Mrs. Brumley described Cook's conduct toward her as a "complete nightmare of sounds being played over a loud system, every night. Someone [i.e., Cook] yelling at you every day, when you are trying to feed your animals, sending you text messages constantly, calling you white trash, you're poor, you have to sell vegetables.

Where are you going to live[?]" Tr. Vol. 2 at 152. She testified that she had come to the conclusion that Cook had installed motion sensors on the surveillance cameras to alert her as to their presence and movement, because Cook's view of their property was otherwise obscured by the fence, shrubs, and distance of about a football field. She said that it seemed like she was scarcely out the door when Cook would promptly come outside her gate to accost her or would yell at her from behind the shrubs. According to Mrs. Brumley, Cook berated her in person "more than forty" times. *Id*. at 228. When she was not berating her in person, Cook often sent Mrs. Brumley text or phone messages insulting, berating, or threatening her. In one text, she said that she was in negotiations with the Brumleys' bank to buy their property. State's Ex. 13. Mrs. Brumley summed up the effects of Cook's conduct as follows:

> When someone can come out of the gate, or shrub without you seeing them coming at you, and you know that they have been watching you, they know when you are home, they know when you are outside, it's a little creepy. And to know that they have all of these camera pictures, of you, they know private things about your financial matters that, your neighbor probably, doesn't usually know about your neighbor, and they tell you that they are going to own your house, different things like that, that is scary, it is very scary …. It caused me to feel very intimidated.

Tr. Vol. 2 at 167. A reasonable person would have felt harassed, frightened, or intimidated by the constant surveillance and onslaught of threats and insults that Mrs. Brumley endured.

[18] Cook claims that her case is similar to *VanHorn v. State*, where we reversed a stalking conviction because the evidence was insufficient to establish a course of improper conduct aimed directly at the victim. 889 N.E.2d 908, 910-11 (Ind. Ct. App. 2008), *trans. denied*. In *VanHorn*, the record showed that on four separate occasions the defendant sat in his parked vehicle, which was facing the wrong direction on the street outside the victim's home, and looked at the victim's home, sometimes through binoculars. *Id*. at 909-10. He never approached the house or even left his vehicle, and he never stepped onto the victim's property or made any contact with the victim, whether in person, by phone, or by a note. *Id*. at 911. In contrast, here, Cook engaged in a protracted, multifaceted pattern of harassment, with her conduct (and cameras and loudspeakers) aimed directly at the Brumleys. She surveilled them, harassed them with loud animal noises designed to agitate their livestock and attract predators, and made direct contact with them via phone calls, text messages, and verbal threats and tongue lashings. *VanHorn* is clearly distinguishable.

[19] Cook downplays her conduct, characterizing it as simply annoying, nuisance-type behavior that a reasonable person would not view as criminal behavior, particularly in the absence of a noise ordinance. The jury did not see it that way. With respect to the Brumleys, Cook was not simply an annoying and boisterous neighbor; rather, she engaged in a daily (and nightly) barrage of threats and harassment for more than six months. Text messages recovered from Cook's cell phone reflect an attitude that was almost gleeful as she

bragged to a friend about how she would not stop until she had driven the Brumleys out of their home, about her contribution to the Brumleys' loss of several animals to predators, and even about the exacerbation of Daughter's epileptic episodes. State's Ex. 43. The Brumleys knew enough about Cook to take her seriously when she said that she was negotiating with their lender or suggested that they had better be careful or the IRS would come after them. Mrs. Brumley testified that she believed that Cook had the means and the resources to follow through and buy their home out from under them because "that's what she does, she buys and sells homes." Tr. Vol. 2 at 168; *see also* State's Ex. 42 (Cook's text message that Brumley house "will be my 11[th] home that I will own outright.!"). In short, the record supports a reasonable inference that Cook possessed both the ability and the will to make good on her threats, and the Brumleys understood this all too well. Cook's attempts to characterize the Brumleys' fear as unreasonable is a self-serving invitation to reweigh evidence and reassess witness credibility, which we may not do.

[20] That said, we acknowledge that Cook's repeated blasting of animal noises was a nuisance to all the surrounding neighbors, many of whom called 911 on her. But her conduct in surveilling the Brumleys, making threats to them in person, by phone, and by text message, and in some cases following up on those threats, went well beyond annoyance. For six months, she watched and studied their daily activities and harassed them relentlessly, causing them to feel frightened, intimidated, and threatened. She was nothing if not persistent. The Brumleys suffered emotional harm and economic harm, as well as the physical

effects of prolonged sleep deprivation and the angst and heartache of watching Daughter suffer an increase in grand mal seizures, all as a result of Cook's persistent harassment. Simply put, Cook was a nuisance to the neighborhood, but to the Brumleys, she was a stalker. The evidence is sufficient to support her convictions.

## Section 3 – The restitution order includes an incorrect calculation of Mrs. Brumley's lost wages.

[21] Finally, Cook asserts that the amount of restitution is inaccurate and does not reflect the actual amount of lost wages sustained by Mrs. Brumley. Generally, we review restitution orders for an abuse of discretion, which occurs when the trial court misinterprets or misapplies the law. *Akehurst v. State*, 115 N.E.3d 515, 518 (Ind. Ct. App. 2018). "A restitution order must be supported by sufficient evidence of actual loss sustained by the victim of a crime." *Id*.

[22] Cook argues that Mrs. Brumley failed to provide sufficient documentation concerning her lost wages. The trial court ordered Cook to pay the Brumleys $800 in restitution. Appellant's App. Vol. 2 at 67. This figure was based on information that Mrs. Brumley included in the victim impact statement and restitution claim form. On that form, she claimed $100 in unreimbursed insurance claims plus $700 in lost wages. However, she handwrote the following on the form by the line for lost wages: "16 hrs work at 20.00 hr." *Id*. at 168. The product of sixteen times twenty is $320, not $700. We acknowledge the State's assertion that Cook failed to object to the amount of the restitution order below, which generally results in waiver. *Gil v. State*, 988

N.E.2d 1231, 1235 (Ind. Ct. App. 2013). However, the document submitted by Mrs. Brumley includes an incorrect calculation of lost wages that is plain and obvious. We therefore may treat it as an improper sentence, which is a form of fundamental error, and correct it even though it was not raised in the trial court. *Id.*; *Ware v. State*, 816 N.E.2d 1167, 1179 (Ind. Ct. App. 2004). Accordingly, we remand for the trial court to enter a corrected victim restitution order.

[23] Affirmed and remanded.

Robb, J., and Brown, J., concur.