FILED

Dec 05 2018, 7:38 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Mark F. James
Anderson Agostino & Keller, PC
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Joshua Sage,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

December 5, 2018

Court of Appeals Case No.
18A-CR-1557

Appeal from the St. Joseph
Superior Court

The Honorable Jeffrey L. Sanford,
Judge

Trial Court Cause No.
71D03-1708-MR-11

**Riley, Judge.**

# STATEMENT OF THE CASE

[1] Appellant-Defendant, Joshua Sage (Sage), appeals his conviction for two Counts of felony murder, Ind. Code §§ 35-42-1-1(3)(B); 35-48-4-1.1.

[2] We affirm.

# ISSUES

[3] Sage presents two issues on appeal, which we restate as:

> (1) Whether the trial court abused its discretion when it admitted his statement made to police while he was hospitalized for injuries sustained during the offenses; and

> (2) Whether the State produced sufficient evidence to prove the offenses beyond a reasonable doubt.

# FACTS AND PROCEDURAL HISTORY

[4] In the days preceding August 2, 2017, Jermon Gavin (JG) contacted Ron Snyder (Snyder) to arrange the purchase of a large amount of methamphetamine. Snyder, in turn, contacted Sage, who agreed to supply approximately one and one-half pounds of methamphetamine to sell to JG. Sage was to deliver the drugs to Snyder's home located in the 2100 block of Frederickson Street in South Bend, Indiana. Sage did not feel at ease about the deal with JG from the beginning, and he knew that it was necessary for his

personal safety to be armed when dealing in such a large quantity of methamphetamine. Sage carried a Sig Sauer handgun. He also arranged for his brother, Robert Brady (Brady), to accompany him to Snyder's home to "have [his] back." (Exhibit 135, Exh. Vol. I, Clip 3 at 10:30-:33). Sage provided his brother with a Smith and Wesson handgun.

[5] During the evening of August 2, 2017, Sage and Brady brought the methamphetamine to Snyder's home. There were at least nine other people present at Snyder's home that evening, including Alyssa Sanchez (Izzy). Sage transported the methamphetamine in a plastic grocery bag in which he also stowed his own "bowl" used for smoking meth. (Transcript Vol. 3, p. 76). Upon arriving, Sage and Brady went to the basement of Snyder's home, where they consumed methamphetamine. Either Brady or Sage armed Snyder with a handgun.

[6] Unbeknownst to them, JG and his associates, Jesus Pedraza (Jesse) and Benito Pedraza (Benny), had decided to steal the methamphetamine, so they armed themselves with handguns prior to going to Snyder's home. As part of their plan, they dropped off Damon Bethel (Bethel), who was also carrying a handgun, in an alley near Snyder's home. JG and the Pedraza brothers arrived at Snyder's home shortly before midnight. While Benny remained in their car parked across the street from Snyder's home, JG, Jesse, Sage, Brady and Snyder convened in the attached garage of Snyder's home, leaving the garage door open looking out onto Frederickson Street. Sage produced the methamphetamine for JG and Jesse to sample, inspect, and weigh. As the

methamphetamine deal unfolded, Anton James (James), pulled up in a white SUV in front of Snyder's home. James had come to the home to sell Izzy marijuana. Although James was known to Snyder and others at Snyder's home, he was not a participant in the methamphetamine deal. Sage saw the SUV pull up outside, and it made him nervous.

[7] Jesse eventually left the garage and telephoned JG's cell phone to inform JG that he intended to go through with the theft of the methamphetamine. As JG withdrew from the garage, Bethel ran in with his gun drawn, demanding the methamphetamine. According to Sage, Bethel did not await a response before firing on Sage. A fusillade of gunfire ensued as Sage and Brady exchanged shots with JG and Bethel. In addition, when the firing started, Benny emerged from their parked car and paused to fire into the white SUV before directing additional shots into the garage. James sped away with Izzy in the SUV but crashed the SUV two blocks away. James perished in his SUV from a bullet which struck his aorta. Back in the garage, Sage and Brady had both shot Bethel, who died lying face down in the garage. Sage was shot four times. Law enforcement arrived quickly. A total of fifty-one shell casings were recovered from the scene. Sage had fired his handgun at least fourteen times.

[8] On August 7, 2017, investigators attempted to interview Sage, but he invoked his right to counsel and did not consent to be interviewed. On August 8, 2017, while Sage was still hospitalized, the State filed an Information, charging Sage with two Counts of felony murder, one Count of dealing in methamphetamine, and one Count of attempted dealing in methamphetamine. On August 12,

2017, Sage communicated to the officer guarding him that he wished to speak to investigators. While being treated for his injuries, Sage had received pain medications, including fentanyl and morphine. Sage last received fentanyl on August 5, 2017. Although fentanyl is a strong medication, its effects dissipate rapidly. On August 13, 2017, Sage received a final, low dose of morphine at 2:58 a.m. Sage also received a dose of Narco, which is a blend of Tylenol, acetaminophen, and hydrocodone, at 9:07 a.m. Sage was being administered Narco to transition him from morphine in preparation for his discharge from the hospital. Narco is a medication that is prescribed for outpatient use that may be taken without hindrance to daily function. The registered nurse charged with administering Sage his medication found him to be lucid, cognizant, and alert on August 13, 2017. The medication nurse did not note that Sage was experiencing any cognitive or memory issues that day.

[9] On August 13, 2017, Detectives Timothy Wiley (Detective Wiley) and Gery Mullins (Detective Mullins) went to the hospital to interview Sage, as per Sage's request. Before interviewing him and according to their usual practice, the officers contacted Sage's medication nurse who informed them that she had no concerns about Sage's ability to speak with them. The interview, which was videotaped, began at 12:50 p.m. Detective Wiley read Sage a waiver of attorney rights form that provided that Sage had previously requested an attorney, now wished to waive his right to an attorney, had initiated the interview, and had requested to make a statement. Sage confirmed that those provisions were true and signed the waiver of attorney form. Detective Mullins

then provided Sage with his *Miranda* advisements and asked Sage if he had any questions, to which Sage responded, "No, I understand." (Exhibit 135, Exh. Vol. I, Clip 1 at 2:57-3:01). Detective Mullins read Sage a waiver of his *Miranda* rights, and Sage confirmed to Detective Mullins that the provisions of the waiver were true before signing the form.

[10] At the beginning of the interview, Detective Mullins asked Sage to explain to them what happened, and Sage spoke largely uninterrupted about the drug deal and shootings for approximately five minutes. Sage provided detailed physical descriptions of JG, Jesse, and Bethel, and their movements during the offenses. Sage admitted that he shot at Bethel with the Sig Sauer handgun and that he was probably the person who killed him. Sage also thought it was possible that he had fired in the direction of the open garage door. Throughout the interview, Sage responded to the detectives' questions, and he asked the detectives questions of his own. Sage provided the detectives with his address and his cell phone number. The interview concluded at 1:42 p.m. On August 14, 2017, Sage was discharged from the hospital into police custody.

[11] On January 22, 2018, Sage filed a motion to suppress his August 13, 2017, statement, arguing that his injuries and the medications he received could "affect a person's ability to give a free, voluntary and knowing statement." (Appellant's App. Vol. II, p. 13). On May 4, 2018, the trial court held a hearing on Sage's motion to suppress. The trial court denied Sage's motion the same day, finding that Sage had signed valid waivers of his right to an attorney and to

his *Miranda* rights, that he was lucid during the interview, and that he understood what was being asked of him.

[12] Sage's jury trial took place May 14, 2018, through May 17, 2018. Sage's counsel objected to the admission of Sage's August 13, 2017, statement on the same grounds raised in the previously-denied motion to suppress. The jury found Sage guilty of the four charged offenses. On June 20, 2018, the trial court entered judgment of conviction on the two felony murder convictions only and sentenced Sage to two concurrent terms of fifty-five years.

[13] Sage now appeals. Additional facts will be added as necessary.

# DISCUSSION AND DECISION

## I. *Voluntariness of Statement*

[14] Sage contends that the trial court erred when it denied his motion to suppress. We note that, because this appeal follows the admission of Sage's statement at trial, the issue on appeal is better framed as whether the trial court erred when it admitted the challenged statement at trial. *Guilmette v. State*, 14 N.E.3d 38, 40 (Ind. 2014). As a general rule, the trial court has broad discretion to rule on the admissibility of evidence. *Id*. We review for an abuse of the trial court's discretion and reverse only when the admission of the challenged evidence is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights. *Id*.

[15] Sage argues that his "rights to due process were violated because the officers did not verify that his statements were knowing and voluntary because they did not

ascertain if he was under the influence or otherwise thinking clearly."[1] (Appellant's Br. p. 7). We take this to be a challenge to the voluntariness of his August 13, 2017, statement. Sage argued in his motion to suppress, which formed the basis for his objection to the admission of the statement at trial, that his statement was involuntary under Article 1, Section 14, of the Indiana Constitution. Under Indiana law, the State is required to prove beyond a reasonable doubt that a statement is voluntary. *Weisheit v. State*, 26 N.E.3d 3, 18 (Ind. 2015), *cert. denied*. When evaluating the voluntariness of a statement, the trial court considers the "totality of the circumstances, including any element of police coercion; the length, location, and continuity of the interrogation; and the maturity, education, physical condition, and mental health of the defendant." *Id*. (quoting *Wilkes v. State*, 917 N.E.2d 675, 680 (Ind. 2009)) (internal citations omitted). We review the trial court's determination of voluntariness as a sufficiency of the evidence issue. *Id*. We do not reweigh the evidence, and we will affirm if the trial court's finding of voluntariness is supported by substantial evidence. *Id*.

[16] Here, as was noted by his medication nurse, Sage was lucid, cognizant, and alert the day he made his statement. He was not experiencing any memory or

---

[1] Inasmuch as Sage attempts to argue that he did not validly waive his right to counsel or that the procedural safeguards required for a valid guilty plea should be applied to the giving of a statement to police, we note that Sage did not raise these arguments in his motion to suppress or at trial. Arguments raised for the first time on appeal are waived. *See Leatherman v. State*, 101 N.E.3d 879, 885 (Ind. Ct. App. 2018) ("[A] party may not present an argument or issue on appeal unless the party raised that argument or issue before the trial court. In such circumstances the argument is waived."). As such, we decline to address those arguments.

cognitive issues. Detectives Wiley and Mullins spoke with the medication nurse before interviewing Sage to confirm that he was able to speak with them. Detective Mullins read to Sage a waiver of his right to an attorney and a waiver of his *Miranda* rights which Sage indicated he understood before signing. The interview itself was conducted informally in a conversational tone and lasted approximately one hour. Under the totality of these circumstances, we conclude, as did the trial court, that Sage's statement was voluntary.

[17] Sage contends that his statement was not voluntary because of his injuries, the medication he was receiving, and what he characterizes as his "poor" recollection. (Appellant's Br. p. 7). However, Sage's conclusory statements that these factors affected his ability to give a voluntary statement enjoy little evidentiary support in the record. By August 13, 2017, when he gave his statement, Sage had recuperated sufficiently that he was to be discharged from the hospital the following day. Sage had received a low dose of morphine at 2:58 a.m. that day and a low dose of Narco at 9:07 a.m, but there is simply no indication in the record that these medications affected Sage's awareness, ability to understand his rights, or his ability to recollect events. As pointed out by the State, in order for intoxication to render a statement involuntary, a defendant must be unaware of what he is saying. *Wilkes*, 917 N.E.2d at 680. Sage does not argue on appeal that he was unaware of what he was saying when he spoke with the detectives. Indeed, Sage spoke coherently and extemporaneously throughout the interview, responded appropriately to the detective's questions, and accurately recollected many details of the offenses.

Because we conclude that Sage provided a voluntary statement, we find no abuse of the trial court's discretion in admitting his statement at trial.

## II. *Sufficiency of the Evidence*

[18] Sage challenges the evidence supporting his two convictions for felony murder. When we review the sufficiency of the evidence to support a conviction, we consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). It is not our role as an appellate court to assess witness credibility or to weigh the evidence. *Id*. We will affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id*.

[19] Felony murder occurs when a person kills another human being while committing or attempting to commit dealing in methamphetamine. Ind. Code §§ 35-42-1-1(3)(B); 35-48-4-1.1. Here, the evidence showed that Sage brought one and one-half pounds of methamphetamine to Snyder's home on August 2, 2017, in order to sell it to JG, a gun battle ensued when one of JG's confederates, Bethel, attempted to rob Sage, and that Bethel and James died of gunshot wounds sustained in the exchange of gunfire between the would-be sellers and the would-be buyers. Nevertheless, Sage challenges the evidence supporting his convictions for killing both Bethel and James.

[20] Sage contends that the evidence does not support his conviction for killing Bethel because Sage was acting in self-defense when he shot Bethel. However, we agree with the State that self-defense was not available to Sage. Under

Indiana law, a person is not justified in using force in the defense of self if that person is committing a crime. Ind. Code § 35-41-3-2(g)(1). However, the mere fact that a defendant is committing a crime at the time he is allegedly defending himself does not, standing alone, deprive the defendant of the defense of self-defense. *Mayes v. State*, 744 N.E.2d 390, 394 (Ind. 2001). "Rather, there must be an immediate causal connection between the crime and the confrontation." *Id*.

[21] Here, Sage's act of dealing methamphetamine, the underlying felony of the felony murder charge, drew Bethel and his confederates to Snyder's garage to attempt to rob Sage, and a gun battle ensued in which Sage shot and killed Bethel. Thus, there was a direct and immediate causal connection between the crime Sage was committing and the ensuing confrontation. Sage, who does not address the statutory limitation on self-defense in his Appellant's Brief, cannot feasibly argue otherwise. Because Sage's only challenge to the sufficiency of the evidence supporting his conviction for murdering Bethel was that he acted in self-defense, which was not available to him as a defense, we conclude that the State proved Sage's conviction for Bethel's death beyond a reasonable doubt.

[22] Sage's challenge to the sufficiency of the evidence supporting his conviction for murdering James is that it "was not reasonably foreseeable that Anton James would be killed." (Appellant's Br. p. 8). Our supreme court has recognized that the language of the murder statute "does not restrict the felony murder provision only to instances in which the felon is the killer, but may also apply equally when, in committing any of the designated felonies, the felon

contributes to the death of *any person*." *Palmer v. State*, 704 N.E.2d 124, 126 (Ind. 1999) (emphasis added). For purposes of felony murder liability, "it matters not whether the death caused is that of the intended victim, *a passerby*[,] or even a co-perpetrator." *Forney v. State*, 742 N.E.2d 934, 938-39 (Ind. 2001) (emphasis added). A person who commits or attempts to commit one of the felonies designated in the murder statute is criminally liable for a death of another during the commission of the crime if the defendant reasonably should have "foreseen that the commission of or attempt to commit the contemplated felony would likely create a situation which would expose another to the danger of death." *Palmer*, 704 N.E.2d at 126. On review, we must determine whether the defendant's conduct caused or contributed to the victim's death or set in motion a series of events that could have reasonably be expected and did result in death. *Dalton v. State*, 56 N.E.3d 644, 648 (Ind. Ct. App. 2016), *trans. denied*.

[23]    We find the case of *Sheckles v. State*, 684 N.E.2d 201 (Ind. Ct. App. 1997), *trans. denied*, to be instructive. Sheckles attempted to collect a loan by force inside a bar where other patrons were present, thereby committing an attempted robbery. *Id*. at 203. When his plan went awry, Sheckles engaged in a gun battle with the bartender, and one of the bar's patrons was shot and killed. *Id*. The court held that Sheckles had created a dangerous situation in which intervention by a nonparticipant to the underlying felony, the bartender, was reasonably foreseeable and that he had exposed the victim to circumstances which posed a substantial likelihood of fatal injury. *Id*. at 205. The court held

that Sheckles was criminally responsible for the death of the bystander, regardless of who fired the shot. *Id.*

[24] Here, Sage created a dangerous situation by arming himself, Brady, and Snyder in order to deal a large quantity of methamphetamine. Sage went to Snyder's home, which was in an area of South Bend that Snyder characterized at trial as rife with shootings and robberies, to deal the methamphetamine. The home was also located in a residential neighborhood with other houses close by, which increased the likelihood that cars would pass by the garage where the methamphetamine deal was taking place. Indeed, in the moments immediately preceding and following the offenses, three other cars apart from James' SUV passed in front of Snyder's home. Sage's act of dealing methamphetamine from Snyder's garage set in motion the robbery attempt which led to the gunfire that killed James. Benny was in the act of returning fire in Sage's direction when he paused to shoot into James' vehicle. The foreseeability of James' death was more overt than the *Sheckles* victim because Benny, who the State argued at trial actually shot James, was an accomplice along with JG, Jesse, and Bethel in the methamphetamine deal gone bad and not simply a nonparticipant.

[25] In addition, Sage was subjectively aware that the situation was dangerous; he had asked his brother Brady to come along on the deal in order to "have [his] back" because Sage knew it was necessary to protect yourself when dealing in such large quantities of methamphetamine. (Exh. 135, Exh. Vol. I, Clip 3 at 10:30-:33). Contrary to his assertion on appeal, Sage was aware of the fact that James's SUV was stopped in front of the home before the gun battle broke out,

which he related in his statement made him nervous. As a result, it was not only reasonably foreseeable that gunfire might breakout at the drug deal, but it was foreseeable to Sage that the driver of the SUV stopped out front might be shot when Sage began firing. It made no difference that it was Benny who shot James. *Sheckles*, 684 N.E.2d at 205.

[26] Sage likens his case to *Layman v. State*, 42 N.E.3d 972 (Ind. 2015), in which our supreme court reversed Layman's felony murder conviction based on evidence that Layman, who was a juvenile at the time of the offense, had entered a home intending to commit a theft but was unarmed and engaged in no violent or threatening conduct before the homeowner shot one of Layman's accomplices. *Id*. at 979. The court held that, under those circumstances, nothing about Layman's conduct was the mediate or immediate cause of his accomplice's death. *Id*. at 979-80. This case is readily distinguishable in that Sage and his cohorts were all armed, and, thus, violence was contemplated as part and parcel of the methamphetamine deal.

[27] Although other facts may present a more difficult call on the foreseeability of a bystander's death, the instant case does not present us with the outer limits of felony murder liability for the death of a bystander/nonparticipant in the underlying felony. Because James' death was the foreseeable result of Sage's methamphetamine dealing, we conclude that the State proved that Sage killed James while committing the alleged felony.

# CONCLUSION

[28] Based on the foregoing, we conclude that the trial court acted within its discretion when it admitted Sage's voluntary confession into evidence. In addition, we conclude that the State proved beyond a reasonable doubt that Sage killed Bethel and James during the commission of the offense of dealing in methamphetamine.

[29] Affirmed.

[30] Vaidik, C. J. and Kirsch, J. concur