## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 13 2020, 9:06 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark Small
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Cody Brown, *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, *Appellee-Plaintiff.* | March 13, 2020 <br><br> Court of Appeals Case No. 19A-CR-1742 <br><br> Appeal from the Clinton Circuit Court <br><br> The Honorable Bradley K. Mohler, Judge <br><br> Trial Court Cause No. 12C01-1507-F1-690 |

**Altice, Judge.**

# Case Summary

Following a jury trial, Cody Brown was convicted of Level 1 felony neglect of a dependent resulting in death and Level 2 felony battery to a person less than fourteen years of age resulting in death, both of which related to the death of his infant daughter. Brown claims that his two convictions violate double jeopardy principles, that the trial court abused its discretion when it admitted into evidence two letters that he had written during a police interview, and that his sentence of thirty-two years with two years suspended is inappropriate.

We affirm in part, vacate in part, and remand.

# Facts & Procedural History

Brown and C.B. (Mother) are the parents of one child, A.B., who was born in June 2015. Brown and Mother, then married, lived in an apartment in Frankfort, Indiana. On July 25, 2015, Mother, Brown, and A.B. attended the annual Hot Dog Festival in Frankfort. They went home for a period of time, and then Mother returned to the festival around 8:00 p.m., with Brown staying home to care for A.B. Around 9:00 p.m., Brown brought A.B. in a child seat carrier to Mother at the festival. Mother thought Brown looked "scared" and "nervous" and "like he'[d] been crying." *Transcript Vol. 2* at 24. Brown told Mother that he had tripped in the apartment "over the stroller and the cats" and fell while holding A.B. and that they needed to go to the hospital. *Id.* at 25. Mother saw that A.B. was not breathing normally, her eyes were closed, and Mother "knew something wasn't right." *Id.* Mother and Brown went to the

local hospital, and doctors told them that A.B. should be transferred to Riley Hospital for Children in Indianapolis (Riley). Brown initially expressed reluctance about transferring A.B. to Riley and urged that he, Mother, and A.B. instead go home. Mother asked Brown to go to their apartment to get her phone charger and some clothes, which he did, and while he was gone, she consented to the transfer. After evaluation at Riley, doctors there determined that A.B. had traumatic head injuries.

[4] Meanwhile, Detective Wesley Hickson of the Frankfort Police Department (FPD) began an investigation of A.B.'s injuries. Det. Hickson contacted Brown's family, and thereafter Brown called Det. Hickson and agreed to meet him at Riley. There, Det. Hickson interviewed Mother and Brown separately. Det. Hickson read and Brown signed a *Miranda* waiver form. Brown told Det. Hickson that Mother had left the apartment around 8:00 p.m. and that he had wanted "to go to the freaking . . . concert and not stay home." *Id.* at 81. He told Det. Hickson that he was trying to feed A.B. when there was a knock at the door, which he thought was someone coming to see a piece of furniture that he had listed for sale. Brown told Det. Hickson that, while holding A.B., he got up to answer the door but "[e]ither a cat ran under his feet or he tripped on a stroller and he fell with [the] baby." *Id.* at 82. Brown described that, as he fell, he turned his body in the air to protect A.B. and fell on his shoulder, securely holding A.B.'s head with his arm, so that only A.B.'s bottom made contact with the floor. Brown said that when he answered the door, no one was there. Brown told Det. Hickson that A.B. initially was fussy after the fall and calmed

down when he put her in her car seat, but "something didn't seem right," so he took A.B. to the festival to find Mother "so that they could go to the hospital." *Id*. at 85. Brown told Det. Hickson that, when he went back to the apartment to get the charger and clothes, he moved the stroller into the kitchen from the living room and hallway area.

[5] On July 28, Brown contacted Det. Hickson and asked about the progress of the investigation. Det. Hickson asked Brown to speak with him again, and Brown agreed to come to the FPD the next day. Brown was interviewed by Det. Hickson on July 29 in the interview room. Det. Hickson again read *Miranda* rights to Brown, who signed a waiver of those rights. The interview lasted three hours. Brown initially told Det. Hickson a similar version of events about tripping in the apartment and falling in such a way to protect A.B. from hitting her head. Brown said that the sound that he thought was a knock on the door was not actually a knock but was the neighbors down the hall making noise. He explained to Det. Hickson that he decided to take A.B. to Mother because A.B. began to act not normal and he believed something was wrong. Det. Hickson left the interview for five to ten minutes and, upon returning, advised Brown that the information received from the medical professionals indicated that A.B. was not injured by a fall. As the interview progressed, Det. Hickson said Brown became emotional and changed his version of events, telling Det. Hickson that he had been sitting and feeding A.B., and was rocking her but she would not stop crying and calm down, and he felt himself "getting more frustrated with the baby." *Id*. at 114. Brown said he "went into his own little

world" and when he opened his eyes, he was "rocking the baby too hard." *Id*. Det. Hickson testified that he offered Brown the opportunity to write letters to Mother and A.B. "explaining to them . . . what had happened and his feelings on that." *Id*. at 115. He left Brown in the interview room during which time Brown wrote two letters, one to Mother and one to A.B. Det. Hickson said that, upon returning to the interview room, he (Det. Hickson) read the letters aloud, and Brown signed them. Det. Hickson arrested Brown.

[6] A.B. was treated at Riley for a couple of weeks. Her condition continued to decline, and she was placed for a time on artificial ventilation and nutrition, which later was removed. A.B. died some days later, on August 13, 2015. The autopsy report stated that A.B. died from blunt force trauma to her head, which the pathologist determined was the result of rapid "acceleration/deceleration" movement. *Id*. at 221.

[7] On August 13, 2015, the State charged Brown with neglect of a dependent resulting in death, a Level 1 felony, and battery to a person less than 14 years of age resulting in death, a Level 2 felony. Brown filed a motion to suppress the statements that he made to Det. Hickson, including the letters he wrote to Mother and A.B. Brown's motion asserted that Det. Hickson used "deceptive interrogation techniques" and "psychological intimidation," which rendered his statements involuntary. *Appellant's Appendix Vol. 3* at 29-30. Brown relied, in part, on the fact that that during the three-hour interview Det. Hickson – who Brown knew socially from church and in the community – stated a number of times that he would like to help Brown, that he could not help Brown if he was

not honest, that classes could help Brown, that he could help Brown get through this, and suggested admitting his mistake. Brown maintained that his "will was overcome" due to promises made and coercion. *Id.* at 32.

[8] The State's response observed that Det. Hickson first met with Brown on July 26 at Riley, where Brown was not in custody and signed an Advice of Rights form and that, after Brown called Det. Hickson on July 28 inquiring about the status of the investigation, Brown agreed to come to the police station the following day to talk to Det. Hickson. Brown's mother brought Brown to the police station, and Brown and Det. Hickson met in an interview room. Det. Hickson advised Brown of his *Miranda* rights and he again signed an Advice of Rights form. They met for approximately three hours, and during that time, Det. Hickson stepped out of the room for some minutes on at least two occasions. The State maintained that none of Det. Hickson's interview techniques amounted to psychological intimidation.

[9] Following the motion to suppress hearing, the trial court issued an order denying Brown's motion, finding that the length of the interview was not excessive or unreasonable, especially given that Det. Hickson left the room on two occasions. The court also observed that Brown "is educated, was advised of his *Miranda* rights, was not in custody, and was not restrained[,]" and it found "no evidence" that Det. Hickson was deceptive or utilized psychological intimidation "to any extent that would violate [Brown's] rights." *Id.* at 45.

[10]     The jury trial commenced October 2, 2017.  Among other witnesses, the State called Det. Hickson to testify.  Brown did not object at trial when Det. Hickson testified to the oral statements that Brown had made during his interviews with Det. Hickson at Riley and later at the Frankfort police station.  Det. Hickson testified that he could tell when interviewing Brown at Riley that Brown was "agitated" about the fact that Mother had left him with A.B. while she attended a concert at the festival.  *Transcript Vol. 2* at 81.  Brown told Det. Hickson about having "somewhat of an anger issue" and that he would sometimes punch a wall or pillow to deal with the anger.  *Id*. at 124.  Det. Hickson testified that he and Brown discussed an event that had occurred about two weeks prior, on July 12 or 13, when Mother and Brown took A.B. to a Lafayette hospital because A.B. was not breathing properly due to choking while being fed.  A.B. was transferred at that time from Lafayette to Riley.  No diagnosis was made and A.B. was released.

[11]     During Det. Hickson's testimony, the State sought to admit the two letters that Brown had written during the July 29 interview.  Brown objected on the same grounds raised in his motion to suppress, as well as on the basis that the probative value was outweighed by prejudicial effect.  The trial court admitted the letters over his objection, and the letters were read into evidence.  His letter to Mother included:

> I was talking to [Det. Hickson] and remembered that I was
> rocking [A.B.] trying to get to her to calm down and go to sleep.
> I regretfully admit I got frustrated and went off to my own world
> while rocking her.  When I came to I was going faster th[a]n I

was before. After that I started to feed her again and that is when I fell with [A.B.]. I guess you were right. IT'S ON ME. Anyways I know you want a divorce so I will give you one. I'm so sorry and I do love [A.B.]. Let her know that daddy loves her and never meant to hurt her. I will never forgive myself for doing this even though it was an accident.

*Id*. at 118 (emphasis in original).

[12] Catherine Huber, M.D., a member of Riley's Child Protection Team (the Team) – a group of pediatricians and nurse practitioners who are called to evaluate cases in which there is suspected child abuse or neglect – testified that A.B.'s injuries were caused by "a rapid acceleration and deceleration event where the head is moved back and forth quite quickly[.]" *Id*. at 165. Her final diagnosis was that A.B.'s injuries were from "non-accidental trauma[.]" *Id.* at 164. Dr. Huber testified that, based on her education and experience, Brown's explanation about tripping and falling while carrying A.B. was not consistent with the injuries sustained by A.B.

[13] In addition to calling two witnesses, Brown testified in his own defense. He stated that he was "frustrated" that Mother preferred to go to the festival rather than stay home with her family and "went to [his] own little world to try and calm down" for thirty to sixty seconds, and when he "came out of it," he "recognized that [he] was rocking just a little bit harder than what [he] was initially." *Transcript Vol. 3* at 69-70, 92. Brown stated that he then tried to feed A.B., but she would not take her bottle, and when he got up to answer a knock at the door, he tripped and fell on the stroller and the cats. He testified that he

did not have "any interactions" with A.B. that day "that could have caused her harm." *Id*. at 88.

[14] The jury found Brown guilty of both charges. In December 2017, the trial court sentenced him on Count I to thirty-two years with two years suspended to probation and to a concurrent term of nineteen years on Count II. Brown filed an appeal, which this court dismissed without prejudice in order for him to file a belated motion to correct error concerning alleged juror misconduct, which the trial court denied. Brown now appeals.

# Discussion & Decision

## I. Double Jeopardy

[15] Brown asserts that his convictions for Count I, Level 1 felony neglect of a dependent resulting in death, and Count II, Level 2 felony battery on a person less than fourteen years of age resulting in death, violate the Double Jeopardy Clause of the Indiana Constitution, which provides: "No person shall be put in jeopardy twice for the same offense." Ind. Const. art. 1, § 14. "Indiana's Double Jeopardy Clause ... prevent[s] the State from being able to proceed against a person twice for the same criminal transgression." *Lumbley v. State*, 74 N.E.3d 234, 241 (Ind. Ct. App. 2017), *trans. denied*. Whether multiple convictions violate double jeopardy is a question of law, which this court reviews de novo. *Rexroat v. State*, 966 N.E.2d 165, 168 (Ind. Ct. App. 2012), *trans. denied*.

[16] The Indiana Supreme Court has held that "two or more offenses are the 'same offense' in violation of Article 1, Section 14 of the Indiana Constitution, if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Richardson v. State*, 717 N.E.2d 32, 49 (Ind. 1999). In addition to the same-elements and actual-evidence tests, Indiana also follows a "'series of rules of statutory construction and common law that are often described as double jeopardy, but are not governed by the constitutional test set forth in *Richardson*.'" *Guyton v. State*, 771 N.E.2d 1141, 1143 (Ind. 2002) (quoting *Pierce v. State*, 761 N.E.2d 826, 830 (Ind. 2002)). One of these rules bars "[c]onviction and punishment for a crime which consists of the very same act as another crime for which the defendant has been convicted and punished." *Id*.

[17] Here, Brown argues that Count I and Count II "arose from the same event involving the same child as a victim." *Appellant's Brief* at 26. The State concedes that the two convictions violate principles of double jeopardy. As the State observes, the charging information and closing arguments show that Brown's physical abuse of A.B. was used to show that he endangered her and that he battered her and thus "the very same act" was used to prove both offenses. *Appellee's Brief* at 23. Our court has recognized that imposition of concurrent sentences is insufficient to cure the problem. *See Adams v. State*, 754 N.E.2d 1033, 1036 (Ind. Ct. App. 2001). We therefore remand with

instructions to vacate the conviction for Count II, Level 2 felony battery on a person less than fourteen years of age resulting in death.

## *II. Admission of Evidence*

[18] Brown asserts that the letters he wrote to Mother and A.B. during his interview with Det. Hickson should have been suppressed and not admitted at trial over his objections. The general admission of evidence at trial is a matter we leave to the discretion of the trial court. *See Clark v. State*, 994 N.E.2d 252, 259-60 (Ind. 2013). We review for an abuse of the trial court's discretion and reverse only when the admission of the challenged evidence is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights. *Sage v. State*, 114 N.E.3d 923, 928 (Ind. Ct. App. 2018).

[19] Brown argues that the two letters he wrote during his interview with Det. Hickson were not voluntary.[1] Under Indiana law, the State is required to prove beyond a reasonable doubt that a statement is voluntary. *Sage*, 114 N.E.2d at 928 (citing *Weisheit v. State*, 26 N.E.3d 3, 18 (Ind. 2015), *cert. denied*). When evaluating the voluntariness of a statement, the trial court considers the "totality of the circumstances, including any element of police coercion; the length, location, and continuity of the interrogation; and the maturity,

---

[1] To the extent that Brown contends that his verbal statements to Det. Hickson should not have been admitted, he did not object at trial when Det. Hickson testified to what Brown said during the interviews. Thus, the issue is waived. *Shoda v. State*, 132 N.E.3d 454, 460 (Ind. Ct. App. 2019) (pretrial motions do not preserve error and defendant must make contemporaneous objection when evidence is introduced at trial). The only exception would be for fundamental error, and Brown does not argue or mention fundamental error in his brief.

education, physical condition, and mental health of the defendant." *Id*. The critical inquiry is whether the defendant's statements were induced by violence, threats, promises, or other improper influence. *Scalissi v. State*, 759 N.E.2d 618, 621 (Ind. 2001). We review the trial court's determination of voluntariness as a sufficiency of the evidence issue. *Sage*, 114 N.E.2d at 928. We do not reweigh the evidence, and we will affirm if the trial court's finding of voluntariness is supported by substantial evidence. *Id*. We will consider the foundational evidence from the trial related to the circumstances surrounding the defendant's statements to police, as well as the evidence from the motion to suppress hearing which is favorable to the defendant and which is not in direct conflict with the trial testimony. *See Clark*, 994 N.E.2d at 259 n.9 (citing *Kelley v. State*, 825 N.E.2d 420, 427 (Ind. Ct. App. 2005)).

[20]     Here, at the suppression hearing and at the trial, Det. Hickson testified that Brown contacted him on July 28, Brown's mother brought him to FPD the next day at Det. Hickson's request, Brown signed a Waiver of Rights form, and he interviewed Brown for about three hours in the interview room. Det. Hickson testified that, after Brown changed his story from tripping and falling to acknowledging that he was frustrated and realized he was "rocking the baby too hard," Det. Hickson offered Brown "the opportunity" to write "apology" letters to Mother and to A.B. "explaining to them . . . what had happened and his feelings on that." *Transcript Vol. 1* at 79, 80; *see also Transcript Vol. 2* at 114, 115. Det. Hickson stepped out of the room and observed Brown writing the letters. Det. Hickson denied that he ever made any threats or promises to Brown.

While Brown testified at trial that Det. Hickson did not offer him water or a restroom break, Det. Hickson testified that Brown did not ask to use the restroom and he did not recall whether he offered water to Brown.

[21] At the suppression hearing, Det. Hickson testified that he knew at the time of the interview that Brown was twenty-one years old and had a high school diploma. Det. Hickson acknowledged that because, through his training and experience, he felt that Brown was at first being dishonest, he continued to press Brown with questions, and that once Brown began to open up, Brown became emotional, which Det. Hickson told Brown "was part of the process of taking responsibility for our actions." *Transcript Vol. 1* at 81. With regard to Det. Hickson's various statements to Brown about helping him, Det. Hickson explained that, although he was in search of the truth about what happened to A.B., he was also "there to be [Brown's] voice" and that if Brown had given him information that was contradictory to that which he already had, Det. Hickson would have "looked into it to ensure . . . [Brown] would have been given the fair shake." *Id*. at 85. Det. Hickson stated, "I went above and beyond for [Brown] and his family during this investigation. More so than I've ever done with any other family." *Id*. at 86.

[22] Based on the totality of the circumstances, we find that Det. Hickson's tactics did not overcome Brown's will or render his statement involuntary. Det. Hickson allowed Brown to tell his version of events about how he tripped while holding A.B., but he also told Brown that this version did not comport with the reports of the medical professionals and encouraged him to be honest. Det.

Hickson testified that he offered but did not instruct or require Brown to write the letters. When Det. Hickson read the letters back to Brown, Brown did not contest the statements therein. We find that the trial court's determination of voluntariness was supported by sufficient evidence. Accordingly, the trial court did not abuse its discretion when it admitted the letters at trial.

### III. Sentence

Brown also challenges the thirty-two-year sentence imposed by the trial court. Brown conflates the abuse of discretion standard with the inappropriate sentence standard, arguing: "The sentence was unreasonable given the nature of the offense and Brown's character, particularly when the trial court gave no weight to Brown's military service." *Appellant's Brief* at 27. This is improper. It is well-settled that the two types of claims are distinct and are to be analyzed separately. *King v. State*, 894 N.E.2d 265, 266 (Ind. Ct. App. 2008).

Pursuant to Ind. Appellate Rule 7(B), this Court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Deference to the trial court's sentencing decision "should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015). Brown bears the burden of persuading us that his

sentence is inappropriate. *Barker v. State*, 994 N.E.2d 306, 315 (Ind. Ct. App. 2013), *trans. denied*.

[25] An abuse of discretion occurs if the decision is clearly against the logic and effect of the facts and circumstances. *Belcher v. State*, 138 N.E.3d 318, 327 (Ind. Ct. App. 2019), *trans. denied*. A trial court abuses its discretion if it (1) fails to enter a sentencing statement at all, (2) enters a sentencing statement that explains reasons for imposing a sentence—including a finding of aggravating and mitigating factors if any—but the record does not support the reasons, (3) enters a sentencing statement that omits reasons that are clearly supported by the record and advanced for consideration, or (4) considers reasons that are improper as a matter of law. *Allen v. State*, 875 N.E.2d 783, 788 (Ind. Ct. App. 2007) (quotations omitted). The relative weight or value assignable to reasons properly found, or to those which should have been found, is not subject to review for abuse of discretion. *Id*.

[26] In the Argument section of his brief, Brown discusses neither the nature of the offense nor his character. Rather, as the State observes, Brown merely recites principles of review (under both Rule 7(B) and abuse of discretion), states the minimum, advisory, and maximum sentences for his offenses, "and ends his argument." *Appellee's Brief* at 25. While Brown mentions in his heading that "the trial court gave no weight to Brown's military service[,]" *Appellant's Brief* at 27, Brown fails to cite to the record or provide any argument in support. In sum, Brown has failed to meet his burden to show either that that his sentence is inappropriate or that the trial court abused its discretion in sentencing him.

[27]     Judgment affirmed in part, vacated in part, and remanded.


Robb, J. and Bradford, C.J., concur.